Comisión para los Asuntos de la Mujer, *ex rel.* A.I.A.R., demandante y apelante, *v.* Miguel Giménez Muñoz, Secretario de Justicia del E.L.A. de Puerto Rico; y Juan González Ríos, demandados y apelados.

*Número:* O-79-213     *Resuelto:* 29 de abril de 1980

*Maricarmen Ramos de Szendrey, Rafael Ortiz Carrión* y *Angelita Rieckhoff,* abogados del apelante; *Héctor A. Colón Cruz, Procurador General,* y *Federico Cedó Alzamora, Procurador General Auxiliar,* abogados de los apelados.

Opinión emitida por el Juez Asociado Señor Negrón García exponiendo la opinión del Tribunal en sus partes I y III.(*)

Se impugna la constitucionalidad de la Regla 154 de Procedimiento Criminal, exigiendo, como requisito para una convicción, la corroboración del testimonio de una mujer alegadamente víctima de violación por un hombre, si se aduce prueba de que ella tuvo con éste relaciones amistosas o amorosas, o íntimas, o de igual naturaleza. (Ley Núm. 209 de 23 de julio de 1974.) Por ello, la apelación trasciende el interés individual de los contendientes, e intenta dar cabida a una norma colectiva de igualdad en el derecho vivo. Sin necesidad de un conocimiento técnico legal, la contienda suscita el instinto de justicia que anida en todos—juristas y legos—el cual es fuerza inspiradora que va diariamente adquiriendo mayor energía y aplicación contra el anacronismo y la antinomia que aún subsiste en nuestra sociedad en perjuicio de la mujer.

I

Este singular drama judicial se inicia mientras pendía ante el Tribunal Superior, Sala de Caguas, causa criminal contra Juan González Ríos por el delito de violación en la persona de A.I.A.R. (¹) Por haber existido previamente relaciones amorosas entre dicho acusado y la supuesta víctima—según estipulación—el Ministerio Fiscal creyó

---

(*) El Juez Asociado Señor Irizarry Yunqué se une a la totalidad de la Opinión; los Jueces Asociados Señores Dávila, Torres Rigual, Martín y Díaz Cruz a las partes I y III. El Juez Presidente, Señor Trías Monge y el Juez Asociado Señor Rigau concurren con el resultado sin opinión.

(¹) Omitimos el nombre en protección de su privacidad.

necesario y se proponía presentar prueba de corroboración del testimonio de ésta. En vista de ello, en el Tribunal Superior, Sala de San Juan, la Comisión Para los Asuntos de la Mujer, a través de su antecesora, (²) *ex rel.* A.I.A.R., solicitó (³) sentencia declaratoria e *injunction* contra el Secretario de Justicia y Juan González Ríos, para que se ordenara al Ministerio Fiscal abstenerse en dicho juicio criminal de presentar prueba de corroboración, y que además, se decretara ese requisito nulo e inconstitucional a la luz de las disposiciones de las Secs. 1 y 7 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico.

Previo diligenciamiento de emplazamientos al efecto, la Sala de San Juan celebró vista en la cual se discutió y declaró sin lugar una moción de desestimación promovida por el Secretario de Justicia. La demandante urgía el remedio de *injunction* aduciendo la posibilidad de que el

---

(²) Antes denominada *Comisión para el Mejoramiento de los Derechos de la Mujer* hasta su modificación mediante la Ley Núm. 56 de 30 de mayo de 1979. La Comisión basó su capacidad en que su Ley Orgánica, Núm. 57 del 30 de mayo de 1973, le otorgó autoridad para iniciar acciones judiciales en evitación de actos discriminatorios por razón de sexo y en representación de parte interesada.

(³) Se alegó la existencia de una controversia real y efectiva en cuanto a los derechos constitucionales de la perjudicada; que la Regla 154 exigiendo corroboración de su testimonio, "de su faz infringía la prohibición constitucional de discrimen por razón de sexo del Artículo II, sección 1 de la Constitución del Estado Libre Asociado", pues a "priori arroja dudas sobre la suficiencia y veracidad del testimonio de toda mujer, ya que se parte de la premisa de que la mujer miente estableciendo mediante dicha regla una diferencia de trato entre la mujer y el hombre"; "que la vigencia en nuestro ordenamiento jurídico de dicha regla no sólo representa un trato diferente, arcaico e injustificado atribuíble a su condición única de femenina, sino una afrenta que constantemente lesiona la dignidad humana de dicho ser"; que tal requisito "de su faz infringe la disposición sobre igual protección de las leyes del Artículo II, Sec. 7 de [nuestra Constitución] ya que considera a la mujer dentro de una clase de testigos con un trato especial y diferente al de cualquier otro testigo. Mientras que en este proceso con el testimonio, de ser creído, de cualquier otro testigo, se podría declarar convicto al acusado..., sin embargo, el testimonio de la mujer [alegadamente] agraviada, no sería suficiente para declararlo convicto aun cuando éste sea creído. Esto es el equivalente a establecer una clasificación arbitraria por razón de sexo" y; que tenía capacidad para presentar la acción por sufrir directamente un daño, en vista de que era inminente la celebración del juicio donde ella declararía y se le violarían sus derechos constitucionales.

caso se tornara académico; sin embargo, sobre este extremo dicho foro consignó su criterio de que por ser un asunto capaz de repetirse, el caso no se convertiría en académico por la terminación del proceso criminal. Las partes estipularon los hechos del caso criminal antes relacionados y la admisibilidad de varios documentos. (⁴)

Anotada la rebeldía al codemandado González Ríos y sometidos memorandos, el tribunal desestimó la solicitud de sentencia declaratoria e *injunction*. Dicho foro analizó las razones tradicionales en apoyo del requisito de corroboración, a saber: que es una salvaguarda esencial en aquellos casos en que el riesgo de una convicción injusta es alta; que intenta proteger al hombre de imputaciones frecuentes producto de la imaginación de las querellantes o donde existe algún motivo para fabricar una acusación; que regularmente tanto el inocente como el culpable cuenta sólo con su propio testimonio como defensa; que el jurado es propenso a inclinarse a favor de la víctima, debilitándose la presunción de inocencia; y que el delito de violación es utilizado como un arma en contra de ciertos sectores sociales. Contrastó estas razones con las posiciones en contrario, según las cuales hay poca evidencia de peso demostrativa de tal inclinación del jurado, y que el requisito por sí es discriminatorio. Luego de evaluar su naturaleza y señalar las disposiciones de la Regla 154.1 de Procedimiento Criminal que hacen inadmisible prueba

---

(⁴) A saber: "1. Que el día 20 de abril de 1978 en una vista preliminar celebrada en el Tribunal de Distrito se encontró causa probable contra el Sr. Juan González Ríos; 2. Que la acción criminal está señalada para el día 20 de junio de 1978, a las nueve de la mañana, en el Tribunal Superior de Caguas; 3. Que A.I.A.R., es la mujer perjudicada y que sí hay prueba sobre relaciones amorosas entre ella y el acusado; 4. Que la parte demandante, de declarar declararía que se le está violando sus derechos a que se [*sic*] discrimine en su contra por razón de sexo, al no dársele a su testimonio credibilidad, situación que pone [*sic*] a ésta a verse humillada y discriminada; [y] 5. Que de declarar el Fiscal Silva Izquierdo, declararía que él u otro Fiscal vendría obligado a presentar prueba de corroboración."

Además, se admitió en evidencia copia certificada de la acusación Núm. 1278-163 contra Juan González Ríos y copia de la minuta del 21 de abril de 1978 en dicho caso.

sobre la conducta o historial sexual de la víctima en casos de violación, enfatizó que la corroboración requerida no es de todos los elementos del delito, y se admiten manifestaciones posteriores oídas por terceras personas como parte del *res gestae*. Siguiendo el análisis de *Reed* v. *Reed*, 404 U.S. 71 (1971), concluyó que no existía trato desigual para hombres y mujeres similarmente situados y no había una clasificación a base del sexo, sino fundada en la característica de una mujer haber tenido relaciones amorosas con el acusado.

No conforme, la parte demandante apeló. Originalmente desestimamos el recurso por entender que no planteaba una cuestión constitucional "justiciable". Sin embargo, a la luz de una reconsideración fue reinstalado hasta que otra vez lo desestimamos al advenir en conocimiento de que el caso criminal había finalizado mediante una declaración de culpabilidad por el delito menor de agresión agravada. Nuevamente fuimos convencidos de que el caso no era académico y decidimos resolver el recurso en sus méritos.

## II

Las vicisitudes procesales del trámite en apelación reseñadas, nos obligan, como prerrequisito a su adjudicación, a unas breves reflexiones sobre las normas jurídicas pertinentes en torno a los conceptos de "cuestión constitucional substancial", "justiciabilidad", "academicidad" y sus otros corolarios. *E.L.A.* v. *Aguayo*, 80 D.P.R. 552 (1958).

A—*Cuestión Constitucional Substancial:*—

Se trata de un recurso apelativo mandatorio en casos civiles conferido a este foro por el inciso (a), Sec. 14 de la Ley de la Judicatura—Núm. 11 del 24 de julio de 1952, según enmendada, 4 L.P.R.A. sec. 37—en sentencias finales dictadas por el Tribunal Superior "en las cuales se plantea o resuelve una *cuestión constitucional sustancial* al amparo de la Constitución de los Estados Unidos o la de

Puerto Rico". (Bastardillas nuestras.) Nuestra doctrina jurisprudencial establece que no existe tal cuestión si un examen del planteamiento invocado refleja la presencia de un error, que tiende a involucrar un argumento constitucional inexistente. *Castrillo* v. *Maldonado*, 95 D.P.R. 885, 889 (1968); *Banco Crédito* v. *Chico Sagastibelza*, 90 D.P.R. 125, 132 (1964); *Fuentes* v. *Srio. de Hacienda*, 85 D.P.R. 492, 512 (1962); *Ortiz* v. *Burgos*, 85 D.P.R. 42, 44 (1962); *Soltero Peralta* v. *Srio. de Hacienda*, 86 D.P.R. 26, 28 (1962).

En el caso de autos se cumple satisfactoriamente esta exigencia. Como correctamente expresó la ilustrada Sala Sentenciadora "la controversia escueta [. . . era] si desde el punto de vista constitucional se justifica o no la corroboración en el delito de violación".

B—*Justiciabilidad:—*

El concepto justiciabilidad tiene su génesis en la jurisdicción norteamericana como derivado del Art. III de dicha Constitución. Requiere la existencia de un caso y controversia real para el ejercicio válido del poder judicial federal. Es el término artístico empleado para expresar una doble limitación impuesta sobre los tribunales, a saber: (1) que sólo pueden decidir "cuestiones presentadas en un contexto adversativo y en una forma históricamente visualizada como capaz de ser resueltas a través del proceso judicial" y (2) la restricción que surge del papel asignado a la judicatura en una distribución tripartita de poderes, diseñada para asegurar que no intervendrá en áreas sometidas al criterio de otras ramas del gobierno. *Flast* v. *Cohen*, 392 U.S. 83 (1968). La doctrina es auto-impuesta. En virtud de ella los propios tribunales se preguntan y evalúan si es o no apropiado entender en determinado caso tomando en cuenta diversos factores y circunstancias mediante un análisis que les permite ejercer su discreción en cuanto al límite de su poder constitucional. Tales elementos son los corolarios de la

norma de justiciabilidad. Es de rigor que pasemos a analizarlos para ver la forma en que se manifiestan en el caso de autos. (5)

1. *Opinión Consultiva (Advisory Opinion):—*

Recoge la norma de que no es función de los tribunales ni éstos pueden actuar como asesores o consejeros. *E.L.A.* v. *Aguayo*, supra, págs. 558–560. Intenta evitar que se produzcan decisiones en el vacío, en el abstracto o bajo hipótesis de índole especulativa. Note: *The Validity of the Restrictions on the Modern Advisory Opinion,* 29 Maine L. Rev., 305–324 (1978).

En este caso no estamos frente a una petición para que emitamos una opinión consultiva solicitada amigable o colusivamente sin la existencia real de adversidad entre las partes. No lo hemos detectado como tampoco ha sido sugerido ni planteado por ninguna de las partes. Por el contrario, se nos pide un remedio que de concederse, como veremos más adelante, no sólo ha de ser efectivo, sino que goza de naturaleza propiamente judicial. No se trata de que el Tribunal pase juicio sobre una controversia hipotética para el beneficio de ambas partes en conducta futura y especulativa, (6) sino que existe un debate

---

(5) Tribe, *American Constitutional Law,* Mineola, N.Y., Foundation Press, 1978, secs. 3-7, 3-8, págs. 52–55. Sobre las consideraciones envueltas en el concepto de justiciabilidad, en Note, *Mootness on Appeal,* 83 Harv. L. Rev. 1672 (1970), se dice: "[El concepto de] justiciabilidad . . . delimita los límites judicialmente percibidos de la competencia funcional de los tribunales. . . . Aunque el concepto se basa en restricciones constitucionales, el Artículo III está tan generalmente redactado que su invocación en aras de impedir revisión es en realidad un ejercicio de autorrestricción por el tribunal en una apreciación de la ausencia de prerrequisitos a la operación exitosa del proceso judicial. Este aspecto de la justiciabilidad persigue satisfacer tres necesidades fundamentales de un tribunal judicial: primero, un récord completo de los hechos en disputa, la materia prima del quehacer decisional; segundo, una presentación de las reclamaciones opuestas y defensas relacionadas a transacciones judiciales y política social, los cuales proveen propuestos criterios impersonales para la decisión judicial; y tercero, el potencial de resolución efectiva de la disputa, la 'raison d'être' de la institución." 1672–73.

(6) No se puede decir que se esté pidiendo al Tribunal que emita "expresiones adelantadas de juicio legal sobre cuestiones que quedan fuera de foco porque no han sido levantadas ante el Tribunal con la clara concreción que se provee cuando una

legítimo en cuanto a los derechos de las partes y se cumplen satisfactoriamente los requisitos procesales para el uso de la sentencia declaratoria como vehículo procesal para despejar esa incertidumbre. ([7])

## 2. *Cuestión Política:—*

No nos enfrentamos a problema alguno de cuestión política o de separación de poderes. *Baker* v. *Carr*, 369 U.S. 186, 217 (1962). Tampoco existe mandato constitucional "demostrable textualmente" asignando el dictamen o solución de la cuestión planteada a otra rama de gobierno. La autoridad para interpretar la Constitución y las leyes del país es prerrogativa de la Rama Judicial. *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750, 759–760 (1977); *E.L.A.* v. *Aguayo*, supra, pág. 598.

## 3. *Madurez (Ripeness):—*

Se ha dicho que la madurez de un caso "enfoca la proximidad temporal del daño sobre el litigante, mientras que la capacidad enfoca la naturaleza del interés invocado por el litigante". Brilmayer, *Judicial Review, Justiciability and the Limit of the Common Law Method*, 57 Boston Univ. L. Rev. 807, 821 (1977). "La Corte ha articulado la madurez a través de una investigación dual: si la controversia sustantiva sobre validez es apropiada para resolución judicial y si el daño a la parte es suficiente para requerir una adjudicación". Albert, L., *Justiciability and Theories of Judicial Review: A Remote Relationship*, 50 So. Cal. L. Rev. 1139, 1155 (1977).

No puede ponerse en duda de que este requisito se ha cumplido en este caso. ([8]) Al ser radicado era inminente

---

cuestión emerge precisamente delimitada cuya decisión se haga necesaria debido al choque de argumentos adversativos que exploran todo aspecto de una cuestión multifacética que envuelve interés, conflictos. . .". Tribe, *op. cit.*, sec. 3-10, págs. 56–57.

([7]) La Ley Uniforme de Sentencias Declaratorias—Núm. 47 de 25 de abril de 1931, 32 L.P.R.A. sec. 2291 *et seq.*—permite la utilización de este medio para hacer planteamientos constitucionales. *Figueroa Ferrer* v. *E.L.A.*, 107 D.P.R. 250 (1978).

([8]) El "análisis de madurez" se centra sobre los tipos de funciones que los tribunales deben desempeñar ". . . la conclusión de que una cuestión no está madura

que se iba a dilucidar la causa criminal iniciada contra González Ríos, y que habiendo mediado relaciones amorosas anteriores con la peticionaria, el testimonio de éste requería corroboración. Ello libra de toda abstracción o contingencia la cuestión planteada. *Rizzo* v. *Goode*, 423 U.S. 362 (1976); *O'Shea* v. *Littleton*, 414 U.S. 488 (1974); *United Public Workers* v. *Mitchell*, 330 U.S. 75 (1974); *Asoc. Guardias Penales* v. *Srio. de Justicia*, 87 D.P.R. 711 (1963).

### 4. *Capacidad (Standing):—*

Respecto a la *capacidad (standing)*, (⁹) de la parte demandante, este elemento difiere de todos los otros ingredientes de justiciabilidad porque gira primordialmente en torno a la parte que prosigue la acción y sólo secundariamente en cuanto a las cuestiones a adjudicarse. (¹⁰) Es objeto de discusión si el requisito de daños, así como el de estar dentro de la "zona de intereses" del estatuto o disposición constitucional pertinente son requisitos constitucionales o si son sólo conceptos para limitar la habilidad de los tribunales para conferir capacidad en ausencia de un estatuto que la otorgue. Se razona que cuando un estatuto otorga capacidad debe inferirse que el derecho de una persona—sea sustantivo o procesal—ha sido lesionado o infringido. Además, confiriéndose a una parte capacidad por vía legislativa, desaparecen en gran

para adjudicación, de ordinario enfatiza un examen *prospectivo* de la controversia que indica que eventos futuros pueden afectar su estructura de manera que determinan su *presente* justiciabilidad, ya sea haciendo más apropiada una decisión posterior o demostrando directamente que la materia todavía no está apropiada para adjudicación por un tribunal bajo el Art. III...". Tribe, *op. cit.*, sec. 3-13, págs. 60–61. En la nota (b) a la pág. 61 expresa el autor que "como materia de artículo III, todo lo que se necesita para asegurar que un caso está maduro es que el evento contemplado— sea conducta privada o acción oficial o ambos—con toda probabilidad va a ocurrir".

(⁹) Entramos en el análisis en cuanto a la existencia de capacidad para litigar la cuestión presentada a tono con la tendencia liberal reconocida y adoptada en *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1978); *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267 (1975); *Salas Soler* v. *Srio. de Agricultura*, 102 D.P.R. 716, 719 (1974).

(¹⁰) Tribe, *op. cit.*, sec. 3-17, págs. 79–82; Nowak, Rotunda y Young, *Constitutional Law*, págs. 69–79 (1978).

medida los escrúpulos judiciales que frenan a los tribunales ante el temor de una violación a la separación de poderes.

En este caso comparecen como demandantes la Comisión y A.I.A.R., presunta víctima de un acusado del delito de violación. La capacidad de la Comisión para "iniciar las acciones que crea pertinente para evitar que se realicen actos discriminatorios por razón de sexo ante los tribunales de Puerto Rico en representación de parte interesada o ante cualquier instrumentalidad, división o subdivisión política del Estado Libre Asociado de Puerto Rico", le ha sido concedida por ministerio de ley y resulta incuestionable. La capacidad de A.I.A.R. cobra virtualidad ya que estaba en eminente peligro que se le violaran sus derechos bajo sus reclamos de "igual protección de las leyes" y que se discriminara en su contra por razón de su sexo en virtud de la exigencia de que en el caso criminal su testimonio fuese corroborado. Poseía un interés suficiente en la controversia, de carácter justiciable. Era de su legítima incumbencia que se resolviera su contención. En resumen, ella hizo alegaciones que la colocaban dentro de la zona de intereses protegidos por la Constitución de Puerto Rico en sus cláusulas prohibitivas del discrimen por razón del sexo, la denegación de la igual protección de las leyes y la violación a la dignidad del ser humano. Esta capacidad es completada por la conferida a la Comisión en ley para iniciar acciones pertinentes en evitación de discrímenes a base de sexo. Tal entidad hace una defensa vigorosa de los derechos de toda mujer colocada en la situación de A.I.A.R., elemento que robustece el cumplimiento del requisito de "caso y controversia". Del mismo modo, el interés del Estado en la constitucionalidad de nuestras leyes, asegura la debida defensa ante el foro judicial.

5. *Academicidad (Mootness)*:—

Este concepto recoge la situación en que, aun cumplidos todos los requisitos de justiciabilidad, los cambios fácticos

o judiciales acaecidos durante el trámite judicial de una controversia, tornan en académica o ficticia su solución. *E.L.A.* v. *Aguayo*, supra, pág. 584. "Las justificaciones que con mayor frecuencia se brindan en su apoyo son: (1) evitar el uso innecesario de los recursos judiciales; (2) asegurar suficiente contienda adversativa sobre las controversias para que sean competentes y vigorosamente presentados ambos lados; y (3) evitar un precedente innecesario." Note, *Mootness*, Bringham Young Univ. L. Rev. 181, 183 (1975); Kates & Baker, *Mootness in Judicial Proceedings: Toward a Coherent Theory*, 62 Calif. L. Rev. 1385 (1974). Sin embargo, cabe mencionar, como excepciones reconocidas a la aplicación del concepto de academicidad y elaboradas para evitar se frustre la justicia: (a) *el carácter recurrente o repetitivo del asunto planteado;* y (b) *la terminación voluntaria por el demandado de su alegada conducta ilegal.*

En cuanto a la aplicación de este requisito al caso ante nos, resolvemos que la terminación del proceso criminal contra González Ríos no tiene el efecto de convertirlo en académico. La controversia no ha perdido vigencia, [11] pues existe todavía una pugna concreta y justiciable entre dos de las partes—*Comisión* v. *Secretario de Justicia*—a pesar de que en cuanto a otra de ellas—A.I.A.R.—el perjuicio de la alegada infracción constitucional ya no exista. Obsérvese, además, que la controversia es susceptible de surgir nuevamente aunque no sea entre los mismos protagonistas. Haya concluido o no el caso entre tales

---

[11] "[U]n caso es académico, y por lo tanto no justiciable, si el paso del tiempo ha hecho que pierda su carácter como una controversia viva de la clase que debe existir [si los tribunales] quieren evitar las opiniones consultivas sobre proposiciones abstractas de ley."

El requisito de que los casos no sean académicos, en sus orígenes no era uno constitucional pero luego se ha encontrado imbuido en la Constitución. Al mismo tiempo, hay quienes sostienen que la norma se deriva también de una sana preocupación de los tribunales por autorestringirse que debe ceder ante cuestiones constitucionales importantes. Tribe, *op. cit.*, págs. 62–63; Nowak, Rotunda y Young, *op. cit.*, págs. 57–58 y Note, *Mootness on Appeal*, supra, 1674–75.

partes, es una controversia "capaz de repetirse pero sujeta a evadir su adjudicación". *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 514–515 (1911).

La conducta humana, aun la patógena, tiende a repetirse. Toda sociedad tiene sus agresores sexuales. Se ha demostrado la existencia de los siguientes tipos:

". . . encontramos entre los casos de violadores al *asaltante agresivo sadista*, para quien la gratificación sexual debe estar precedida, acompañada o seguida de violencia física. Estos hombres odian las mujeres, usualmente actúan solos, frecuentemente usan armas, son indiferentes al atractivo físico de sus víctimas, y muchas veces no pueden culminar el acto sexual. Una segunda variedad es el *delicuente amoral* cuyo concepto de la mujer es aquél de que ella es un mero objeto de placer sexual. Es hedonista, deficiente en sus controles sociales, y no es sadista ni hostil a sus víctimas, aun cuando usará la fuerza para dominar cualquier resistencia. También el *agresor sexual*. El patrón de conducta de estos violadores, bajo influencia del alcohol, [o de alguna otra sustancia] puede variar desde intentos torpes para ganar aceptación de las mujeres, a quienes erróneamente creen amenas, hasta la de aquellos hombres sobre quienes el alcohol tiene el efecto de desencadenar violencia patológica potencial.

La violación es a veces cometida como un acto explosivo por hombres de quien la agresión sexual repentina resulta aparentemente inexplicable, aunque a través de un estudio se revela evidencia psicótica. Existen también aquellos violadores que aplican estándares dobles, diferenciando la mujer buena de la mala, y racionalizando el uso o amenaza de la fuerza, para compeler a la mujer a hacer buena su conducta implícita. (Tales como el haberle aceptado unos tragos, haberse subido en su automóvil, visitado su apartamento, o haberle permitido ciertas libertades con su cuerpo.) Frecuentemente, la violación por este tipo de agresor es una respuesta a lo que interpretan como una conducta provocativa de la mujer. El violador puede también ser un deficiente mental, un psicótico o una mezcla de los tipos antes descritos." D. MacNamara, *Sex Offenses and Sex Offenders*, 376 Annals of Am. Acad. of Political & Social Science 139, 151–152 (1968). (Traducción nuestra.)

Sin duda habrán violaciones en el futuro y surgirán nuevamente los casos en que los acusados habrán tenido relaciones amorosas anteriores con sus víctimas, surgiendo así también la exigencia de corroboración del testimonio de la mujer agraviada. La Comisión seguirá teniendo un interés adverso al del Ministerio Fiscal en cuanto a tal requisito. Los representantes del Ministerio Fiscal continuarán cumpliendo con su deber de presentar prueba de corroboración en casos como el de autos y la Comisión—por ser de opinión que la disposición legal que la requiere es inconstitucional—continuará desempeñando la misión encomendádale de evitar discrímenes por razón de sexo. El requisito de academicidad, distinto al de madurez, "mira primordialmente a la relación entre eventos pasados y el ataque presente para determinar si todavía subsiste un caso o controversia que pase el examen de justiciabilidad del Artículo III". Tribe, *op. cit.*, pág. 62.

Recapitulando, cuando un caso se torna académico, no hay base sobre la cual puede operar la decisión. Nowak *et al.*, *op cit.*, pág. 57; *E.L.A.* v. *Aguayo*, supra, pág. 584. No ocurre aquí así. Este foro puede y debe decidir la cuestión planteada porque aun siendo capaz de repetirse puede evadir revisión por este Tribunal dada la prontitud que venimos inyectándole a los procedimientos civiles y criminales y a las garantías de juicio rápido, entre otras, que existen a favor del acusado. Vivo ejemplo es el presente caso, en el que no obstante haberse acelerado en instancia sus trámites, el proceso criminal terminó antes de haberse podido dilucidar la constitucionalidad de la regla impugnada. Es de aplicación al caso de autos la excepción a la regla sobre prohibición general de entender en casos ficticios acuñada en *Southern Pacific Terminal Co.* v. *Interstate Commerce Comm'n*, supra, y sostenida posteriormente en *Moore* v. *Ogilvie*, 394 U.S. 814 (1969) y *Roe* v. *Wade*, 410 U.S. 113 (1973). En dichos casos influyó la importancia de las cuestiones envueltas. Hemos visto,

además, que un caso no se torna ilusorio por conducta voluntaria de un demandado, quien luego puede "retornar a sus viejos caminos". Nowak, Rotunda y Young, *op. cit.*, págs. 58–59. Si bien originalmente se requería en este respecto que la controversia fuese capaz de repetirse entre las mismas partes, se ha admitido luego la variante de que la controversia pueda repetirse con otras personas.

En conclusión, la apelación es justiciable y no existe obstáculo procesal que nos impida evaluarla en sus méritos.

## III

En *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267, 279 (1975), dijimos:

"En Puerto Rico, nuestra Constitución no sólo garantiza la igual protección de las leyes en su Art. II, Sec. 7, sino que, contrario a la federal, prohíbe *expresamente* en su Art. II, Sec. 1, el discrimen por razón de sexo. En consecuencia, al confrontarnos con la dicotomía que representa la crítica determinación de cuál fórmula analítica aplicar a los casos por razón de sexo, nos inclinamos en favor—debido a la interacción *de los valores contenidos en nuestra Ley Fundamental en contra del discrimen por razón de sexo y la igual protección de las leyes*—de la fórmula de estricta supervisión judicial."

Admitimos también:

". . . que la Constitución reconoce, al igual que la propia naturaleza, diferencias por razón de sexo y permite las mismas si éstas no discriminan." Y que "[e]n virtud de sus diversas disposiciones y su aplicación a distintas áreas, no pueden extenderse prohibiciones absolutas que impidan el ejercicio legítimo del poder de reglamentación del Estado para aprobar medidas razonables con el objetivo de salvaguardar el interés común. Una pieza legislativa debe sostenerse o anularse en orden a la dimensión, sustancialidad y realidad de los principios comunitarios e individuales envueltos y los problemas sociales que intenta corregir."

Reconocimos además "la creciente incorporación de la mujer en las diversas fases de la actividad económica

desplegada por nuestro pueblo [que pone] en entredicho su clásica función que gira sobre el hogar [lo que constituía] un esfuerzo legítimo de la mujer tendente a alcanzar mejores oportunidades de autoexpresión, reconocimiento personal y de sostén para sí y su familia". También nos referimos al derrotero de la Convención Constituyente de "reconocer el advenimiento de la mujer a la plenitud del derecho y a la igualdad de oportunidades con el hombre", y expresamos, que no era "necesario encontrar apoyo en la legislación y jurisprudencia federal sobre derechos civiles, pues nuestra Carta de Derechos es lo suficientemente amplia para cubrir a satisfacción la situación. . .". [12] Finalmente consignamos que la prohibición contemplaba todo trato desigual basado en "premisas subjetivas erróneas, tradicionales y estereotipadas que emanan de una visión masculina que—consciente o inconscientemente—tiene su

---

[12] Reafirmamos nuestra renuencia a utilizar el análisis intermedio de igual protección según establecido en *Reed* v. *Reed,* 404 U.S. 71 (1971) y desarrollado luego en su progenie, en cuanto resulta insatisfactorio para cubrir las variadas situaciones que pueden surgir en el ámbito de la conducta humana en lo que a discrimen por sexo respecta, al etiquetar como tal sólo aquellas clasificaciones basadas en "género como tal", (*Geduldig* v. *Aiello,* 417 U.S. 484 (1974)), y sólo cuando existen hombres y mujeres similarmente situados, tratados en forma distinta. El "test" intermedio a que aludimos, ha sido fraseado en *Craig* v. *Boren,* 429 U.S. 190 (1976), como requiriendo que se cumplan intereses o propósitos gubernamentales *importantes* y que los medios utilizados tengan relación *sustancial* con los objetivos perseguidos. Véase en general: R. Ginsburg, *Sexual Equality Under the Fourteenth and Equal Rights Amendments,* 1979 Wash. U. L.Q. 161 y de la misma autora, *Sexual Equality and the Constitution,* 52 Tul. L. Rev. 451 (1978). K. Endem, *Intermediate Tier Analysis of Sex Discrimination Cases, Legal Perpetuation of Traditional Myths,* 43 Albany L. Rev. 73 (1978); Comment, *Constitutional Law, Equal Protection, Standard of Review Applicable in Sex Discrimination Cases,* 45 Tenn. L. Rev. 514–533 (1978). J. Vincent, *Equal Protection and the Middle Tier, The Impact of Women and Illegitimates,* 54 Notre Dame Lawyer, 303–22 (1978). Comment, *Constitutional Law, Equal Protection—Gender Discrimination—Califano v. Goldfarb,* 23 N.Y.L.S. L. Rev. 503 (1978); Note, *Gender Based Legislative Classifications—Califano v. Goldfarb,* 57 Neb. L. Rev. No. 2, 555 (1978). Particularmente en cuanto a *Craig* v. *Boren,* supra, y el "test" allí enunciado: *Gender Classifications and the Equal Protection Clause,* 42 Miss. L. Rev. 470 (1977); *Gender Based Discrimination and a Developing Standard of Equal Protection,* 46 Univ. of Cinn. L. Rev. 572 (1977); *Gender Based Discrimination and Equal Protection, an Emerging Intermediate Standard,* 29 Univ. of Fla. L. Rev. 582 (1977); Note, *Search for a Standard of Review in Sex Discrimination Questions,* 14 Houston L. Rev. 721 (1977).

razón de ser en la concepción y caracterización de la mujer como 'sexo débil' ". Págs. 279–282.

Con estos pronunciamientos jurídicos dirigimos nuestros esfuerzos a determinar si existe o no una discriminación odiosa en la presente regla de corroboración que frustre el propósito de la Ley Fundamental encarnado en la prohibición del discrimen por sexo en nuestra Constitución.

Lo primero que llama la atención es que el legislador ha establecido una clasificación, que tomando prestada la frase de *Geduldig*, ([13]) supra, no está basada "en género como tal", pues no exige corroboración del testimonio de toda mujer en cualquier proceso criminal, sino sólo de las víctimas en los procesos por violación. Por otro lado, no se exige corroboración del testimonio de la perjudicada en todo caso de violación. Más bien, el legislador para clasificar utiliza como rasgo definidor la circunstancia que la mujer alegadamente violada haya tenido con el acusado relaciones amorosas, de amistad u otra índole similar, con anterioridad a la comisión del delito. Señala así un subgrupo dentro de un género que es el femenino.

([13]) Las decisiones de *Geduldig*, supra y *General Electric Co.* v. *Gilbert*, 429 U.S. 125 (1976), han sido muy criticadas. En éstos el Tribunal se aferró a la decisión estrecha de *Reed* y declaró que una clasificación usando como característica o rasgo la preñez, no violaba la igual protección de las leyes y que no había discriminación basada en el sexo como tal. Algunos perciben estas decisiones como otro rompimiento con la trayectoria de análisis intermedio que venía desarrollándose a partir de *Reed*. Comment, *Sex Discrimination Distinctions Between Title VII and Equal Protection— General Electric Co. v. Gilbert*, 31 Rutgers L. Rev. 91, 100–105 (1978). Comment, *Geduldig v. Aiello, Pregnancy Classification and the Definition of Sex Discrimination*, 75 Colum. L. Rev. 441, 442 (1975). Se especula que el Tribunal parece no haberse percatado de que por el hecho de estar envuelta una característica exclusiva de un sexo puede haber un discrimen oculto. Sin embargo, nos parece que la propia decisión en *Geduldig*, dejó abierta la puerta para que en otro caso pudiera demostrarse que la utilización de la característica exclusiva fuese un nuevo pretexto para discriminar. *Geduldig* se basó primordialmente en un análisis de alternativas y costos encontrándose que el Estado tenía un propósito legítimo y unas razones válidas para excluir la preñez del plan de beneficios envueltos. El caso de *Gilbert*, se sostuvo en razonamientos similares pero disipó las dudas pendientes desde *Geduldig* de si se llegaría al mismo resultado de *Geduldig*—decidido bajo la cláusula de igual protección—bajo el Título VII de la Ley de Derechos Civiles Federal que expresamente prohibía el discrimen por razón de sexo. *Gilbert* fue igualmente criticado y posteriormente revocado por el Congreso.

■ Bajo nuestro más amplio análisis de riguroso escrutinio, podemos advertir y concluir la existencia de una discriminación. Nos explicamos. Aunque bajo nuestro ordenamiento penal, la mujer es la única que puede ser violada, es incuestionable que el interés tutelado por el Legislador es prohibir la relación o agresión sexual contra su voluntad. Aunque técnicamente el hombre no puede ser víctima de este delito, sí puede serlo de otras ofensas o agresiones sexuales. A tales efectos, en años recientes se ha evidenciado una tendencia a reformular mediante un enfoque científico los delitos sexuales integrándolos en estatutos redactados en términos neutrales, en los cuales se tutelan las víctimas de ambos sexos y de todas las edades. Se eliminan así las clasificaciones tradicionales. Brown, *et al.*, *Women Rights and the Law*, New York, Praeger Publishers, 1977, págs. 45–56; Ireland, *op. cit.*, pág. 185. Al comparar el trato que se le brinda a la mujer y al hombre—como víctimas de una agresión sexual—advertimos que a ella se le trata diferente. La mujer, como testigo no goza frente al hombre de la misma presunción de credibilidad, ya que a éste no se le impone ningún obstáculo aun en casos de otros delitos sexuales de los cuales sí pueden ser víctimas. Note, *The Rape Corroboration Requirement Repeal, Not Reform*, 81 Yale L.J. 1365–1372 (1972). Si se toma en cuenta que toda mujer está sujeta al peligro de ser violada por las personas mencionadas en el estatuto, la clasificación viene a ser una que pende perjudicialmente sobre toda la clase [14] y se manifiesta así su endeblez constitucional.

---

[14] K. Karst, *The Supreme Court 1976 Term*, 91 Harv. L. Rev. 241–244, para una posición crítica de la decisión de *Gilbert* en cuanto ésta parece requerir que para que haya discrimen la clasificación sea coextensiva con la clase que se intente proteger. Se arguye allí que: "sólo las clasificaciones más extremas tienen impacto directo o inmediato sobre todo miembro de una clase protegida y que clasificaciones mucho menos inclusivas pueden desfavorecer substancialmente a tal clase [y que ello es] particularmente cierto cuando . . . : (1) la subclase adversamente afectada por una clasificación en particular es amplia en proporción con la totalidad de la clase protegida o (2) *la posibilidad de caer dentro de la subclase que recibe el peso, está dispersada a lo largo de toda la clase aunque relativamente pocas personas caigan realmente dentro de esa subclase.*" (Traducción y énfasis nuestro.)

Lo expuesto queda constatado de una ojeada a los propósitos que movieron a la Asamblea Legislativa a modificar el requisito de corroboración a los fines de limitarlo sólo a los casos de existencia previa de relaciones amorosas, de amistad o igual naturaleza. Su lectura refleja que el estatuto no resiste siquiera un examen de mera racionalidad y menos el análisis estricto. En este sentido su Exposición de Motivos lee:

"El fundamente histórico y clásico legal que dio vida a la regla de corroboración en delitos sexuales, *obedeció a la necesidad de proteger al acusado de imputaciones infundadas y que pudieran ser hijas de la reacción femenina ante el desamor o inconstancia del hombre*, y ello no tiene aplicación en casos de inexistencia de relaciones previas." Ley Núm. 209 de 23 de julio de 1974; 12 Servicio Legislativo de Puerto Rico, Núm. 5, págs. 1352–1353. (Bastardillas nuestras.)

Se revela inmediatamente una expresión legislativa basada en una clasificación imputando a toda mujer que se vea en tal situación, *presunción de que miente*. ¿De lo contrario, por qué exigir se corrobore su testimonio? Del hecho aceptado de que quizás *algunas* mujeres puedan mentir y acusar falsamente de violación, no puede racionalmente inferirse que todas van a hacerlo. No obstante, como resultado se tacha a priori la suficiencia y presunción de veracidad que cobija a todo testigo en nuestra jurisdicción. [15] Ello es una afrenta a su dignidad que agrava la lesión física sufrida y contribuye a que sea víctima de dos ofensas, la del ataque sexual y la de la sociedad.

"En procesos criminales contra acusados de violación, existe una tendencia a considerar la perjudicada como una pieza más de evidencia. El rol de la víctima es establecer un caso legal contra el ofensor; las víctimas frecuentemente informan que sus encuentros con la Policía, fiscales y personal del tribunal fueron más traumáti-

---

[15] Presunción susceptible de ser controvertida por la forma de declarar, el carácter de la declaración o mediante evidencia que afecte su veracidad, honradez, integridad o móviles o por evidencia contradictoria. 32 L.P.R.A. secs. 1661, 1664, 1667, 2150 y Regla 131 de las de Procedimiento Criminal. Además Reglas 10(E), 18, 44, 45 y 46 de las de Evidencia de 1979.

cos que el incidente de la violación." *Judicial Attitudes Toward Rape Victims*, 57 Judicature 303 (1974).

Es evidente que la legislatura ha actuado a base de meras conjeturas, prejuicios arcaicos y nociones estereotipadas, con abstracción de las características verdaderas de los miembros del género femenino. En *Zachry*, supra, dijimos:

"Al condenar el discrimen por motivo de raza, color, sexo, nacimiento, origen social, ideas políticas o religiosas, nuestra Constitución reconoce un sistema jurídico humanitario que postula la dignidad del ser humano, su inviolabilidad e igualdad ante la ley. Con ello se intenta superar y sobrepasar los accidentes circunstanciales que tengan origen en la naturaleza o en la cultura. Es evidente que el sexo, al igual que la raza, constituyen rasgos que surgen en el ser humano por un simple hecho fortuito: el nacimiento; éste nada tiene que ver con la habilidad de la persona de oportunamente aportar y contribuir a los esfuerzos legítimos de una sociedad. Es por ello que nos reafirmamos en que ante este foro judicial, una diferencia basada en el sexo resulta una clasificación sospechosa, en particular cuando la misma tiende a relegar a un estado legal de inferioridad a una clase con abstracción de las potencialidades y características individuales de sus miembros." Págs. 281–282.

El fin legislativo expresado, es de por sí impermisible bajo nuestra Constitución por intentar proteger al hombre no de un peligro real sino de meras sospechas de que pueda ser acusado falsamente de violación, atribuyéndose así a la mujer *en general* una característica o rasgo que no todas poseen. El propósito envuelto choca con la expresión constitucional que veda el discrimen por razón de sexo. Bajo el escrutinio estricto, ha de haber un propósito apremiante de beneficio al interés común. El Estado tiene el peso de probar que no hay otras alternativas menos drásticas y que la clasificación es necesaria. Gunther, *The Supreme Court 1972 Term, In Search of an Envolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1 (1972). Ello no se ha demostrado aquí. Se viola la dignidad del ser humano femenino imponiendo a priori trabas a su credibilidad.

No podemos permanecer impasibles ante el descrédito que sufre hoy día el requisito de corroboración en el delito de violación en un sinnúmero de jurisdicciones, ([16]) advertido su verdadero origen en las visiones arcaicas y estereotipadas prevalecientes en una época de antaño ([17]) y venidas al acervo jurídico actual por voz del famosos jurista inglés Lord Mathew Hales ([18]) y luego a través del tratadista Wigmore. ([19]) El requisito de corroboración tiene hoy escasa validez para corregir los problemas percibidos en la época de sus génesis. Se ha razonado que en los días de Lord Hale, en que no habían cristalizado como derechos el debido proceso, la presunción de inocencia, el principio de la duda razonable, la asistencia de abogado, o el descubrimiento de prueba, *subpoenas*, quizás se justificaba lo dicho por ese jurista: "Así, en un período de la historia en el que la gente creía en brujerías y en el uso del cinturón de castidad, se justificaba

---

([16]) Para un análisis de la situación en los diferentes estados: Note, *supra*, 81 Yale L.J. 1365, 1366–67 (1972). D. Luginbill, *Repeal of the Corroboration Requirement, Will It Tip the Scales of Justice?* 24 Drake L. Rev. 669, 672–73 (1975). Note: *The Victim in a Forcible Rape Case*, II Am. Crim. L. Rev. 335, 336 (1973). J.B. Pratt, *The Demise of the Corroboration Requirement*, 26 Emory L.J. 830–32, Notas 134 y 135 (1977); M. Ireland, *Reform Rape Legislation*, 49 Univ. of Colo. L. Rev. 185, 192–93, 197 (1978); Note, *Corroborating Charges of Rape*, 67 Col. L. Rev. 1137, 1137–38 (1967).

([17]) Entre las concepciones arcaicas y estereotipadas que han dado base al requisito de corroboración en sus orígenes se encuentran, a manera de ejemplo: la visión de que muchas veces la fémina se somete cuando le han "hablado mucho" y ha tomado licor, para luego decir que ha sido violada; o que muchas veces dice que no con la boca, pero están diciendo que sí con los ojos; o que las mujeres usan las leyes de violación para conseguir al hombre que quieren. Rosenblat, *Justice Denied*, pág. 36 (1971), citado en Note, *supra*, II Am. Crim. Rev. 335 (1972). J. Mercado Ruíz, *Violación Sexual: Nueva Responsabilidad del Estado*, II, Núm. 1, Rev. Ad. Pub., 99 *et seq. (1978)*.

([18]) Lord Hales en Inglaterra se expresó de la siguiente manera: "la violación es una acusación fácil de hacer y difícil de probar y más difícil aún para defenderse de ella la parte acusada." Cita tomada de Note, *supra*, 67 Col. L. Rev. 1137 (1967).

([19]) Wigmore dio gran impulso a las ideas de Lord Hales expresándose a favor de la corroboración del testimonio de las víctimas de violación. Por ello ha sido muy criticado pues sus fundamentos son de dudosa validez. Ver: Note, *supra*, II Am. Crim. L. Rev. 335, 336–337 (1972–73). O'Neale, *Court Ordered Psychiatric Examination of a Rape Victim in a Criminal Rape Prosecution or How Many Times Must a Woman be Raped?* 18 Santa Clara L. Rev. 119, 120–121 y 133–135 (1978).

tal precaución especialmente cuando el violador sufría la muerte en la horca como resultado de su convicción". El Tribunal Supremo de California, al invalidar en *People* v. *Rincón Pineda*, 538 P.2d 247 (1975), las instrucciones de tomar cautela con relación al testimonio de la víctima de violación, con gran pragmatismo expresó: "Cuando un prisionero está indefenso, su posición es a menudo lamentable aun si tiene un buen caso; reconocemos que bien pudo haber tenido mérito la aserción de Hales de que un procesamiento por violación era un instrumento ideal de malicia dado que forzaba a un acusado, en juicio por su vida, a pararse solo ante un jurado inflamado por pasiones y a intentar refutar un relato cuidadosamente elaborado sin el beneficio de abogado, testigo o siquiera la presunción de inocencia. Pero el espectro de una convicción equivocada, sea por violación o cualquier otro crimen, ha llevado a nuestra sociedad a armar a los acusados modernos con los avíos del debido procedimiento que hacen el constreñimiento adicional de la cautela de Hales supérfluo y caprichoso". [20]

El requisito de corroboración, junto a otras reglas evidenciarias especiales que fueron desarrollándose para el delito de violación, descansaron en varias creencias según las cuales dada la severidad de la penalidad por el delito de violación, que en muchos ordenamientos llegaba hasta la pena de muerte y las circunstancias en que de ordinario se cometía el delito—sin la presencia de testigos, en sitios aislados y oscuros—era injusto dejar al acusado con sólo su palabra ante la de la víctima. Máxime cuando el delito de violación era altamente represible en la sociedad, pudiendo ello dar lugar a que el juez o jurado se parcializaran a favor de la víctima y en contra del acusado, resultando ello a su vez en una convicción injusta de un inocente. Fundamental en la justifica-

---

[20] Ver Armand Arabian, *The Cautionary Instruction in Sex Cases: a Lingering Insult,* 10 S.W. Univ. L. Rev. 588–590 (1978); Comment, *People v. Rincón Pineda,* 16 Santa Clara L. Rev. 691, 692 (1975–76). Para una posición en el sentido de que las palabras de Lord Hales han sido además mal interpretadas o tomadas fuera de contexto, véase J. Pratt, *op. cit.,* 26 Emory L.J. 805, 811–12, 813–14 (1977).

ción del requisito de corroboración era también la creencia de que la acusación de violación era fácil de hacer y difícil de rebatir o defenderse de ella.

Aunque en nuestra jurisdicción la penalidad por una convicción por el delito de violación es severa, es incuestionable que todo acusado tiene a su disposición eficaces recursos tales como el contrainterrogatorio, descubrimiento de prueba y otros mecanismos procesales, que salvaguardan y remedian la situación de falta de prueba corroborativa. Siempre hay la posibilidad de poder presentar prueba circunstancial que evite que se pueda determinar culpabilidad más allá de duda razonable. Aun cuando existen riesgos de convicciones injustas, no es menos cierto que el requisito de corroboración y sus reglas hermanas, han causado un mal mayor por cuanto parecen funcionar para hacer sumamente difícil una convicción, aun en casos claros, por no haber tal corroboración. Además, los procesos investigativos del delito funcionan como un filtro para evitar que los casos débiles lleguen a juicio.

No se nos escapa el argumento de que es fácil fabricar una acusación convincente y detallada de una violación. Al reflexionar sobre el mismo, sin embargo, advertimos que hay factores que vigorosamente actúan como disuasivos a la radicación de una causa por violación, a saber, las molestias, contratiempos y vejámenes del proceso, así como el estigma imborrable que acarrea para las víctimas. Estos factores inhibitorios han influido para que en nuestra jurisdicción se haya legislado para excluir al público de la sala cuando la perjudicada vaya a declarar (Regla 131 de las de Procedimiento Criminal, 1963) y para evitar, excepto en circunstancias especiales, que sea inadmisible evidencia sobre el historial o conducta sexual anterior de la perjudicada. (Regla 154.1 de las de Procedimiento Criminal.)

En cuanto al planteamiento respecto al peligro de que exista prejuicio por parte del juez o del jurado en contra del acusado por simpatizar aquéllos con la víctima, basta señalar

que los estudios realizados sobre este asunto indican precisamente lo contrario. Los resultados reflejan una marcada renuencia—aun en jurisdicciones donde no se *exige* la corroboración—a condenar a un acusado si solo existe el testimonio de la víctima. [21] Así mismo, demuestran una tendencia en los jurados a absolver en los casos ordinarios de violación y a condenar sólo cuando hay circunstancias agravantes establecidas tales como el uso de la fuerza o abusos brutales. [22] Muchos jurados y algunos jueces lamentablemente acogen la teoría de que la violación es un crimen precipitado por la conducta de las víctimas. Al presente existe una tendencia a estimar suficientes para proteger al acusado en estos casos las garantías dispuestas en el procedimiento penal, tales como la presunción de inocencia y la norma de no condenar a un acusado sin un convencimiento de su culpabilidad más allá de toda duda razonable. [23] Esta misma tendencia a estimar

---

[21] Aunque la información es limitada, en Puerto Rico, después de eliminada la regla absoluta sobre corroboración, a partir de los años 1974–75 hasta el 1977–78, las estadísticas disponibles no reflejan un patrón definido en que predomine una preferencia por la convicción de los acusados. Si pudiera hacerse alguna inferencia válida de esta limitada información, indicaría una aparente inclinación hacia la absolución:

| DISPOSICION | DELITO | |
| | Violación | Ataque P/C Violación |
| --- | --- | --- |
| Alegación Culpabilidad | 218 | 120 |
| Convicciones | | |
|    Tribunal de Derecho | 50 | 25 |
|    Jurado | 32 | 5 |
| Absoluciones | | |
|    Tribunal de Derecho | 110 | 14 |
|    Jurado | 21 | 5 |

[22] C. Burnim, *Massachusetts Rape Shield Law—An Over Step in the Right Direction*, 64 Mass. L. Rev. 61, 62 nota 11 (1979); Comment, *Arnolds* v. *United States*, 358 A.2d 335 (1976) en 15 Duquesne L. Rev. 305, 312 (1976–77), donde se cita el estudio de Kalven and Zeizel, *The American Jury*, 249 (1966), para esos hallazgos.

[23] J. Pratt, *op. cit.*, pág. 839 donde se expresa que basta para proteger al acusado la presunción de inocencia y el poder del juez para ordenar dejar sin efecto el

suficientes tales garantías está detrás de la derogación o eliminación por legislación o jurisprudencia de otras disposiciones evidenciarias que se basaron en las mismas concepciones que el requisito de corroboración, a saber, la norma de instruir al jurado a tomar con cautela el testimonio de la víctima [24] y las reglas según las cuales la conducta o el historial sexual de la perjudicada podía ser traído a colación a fines de impugnar la credibilidad de la acusada en cuanto a su falta de consentimiento al acto sexual o a fines de la determinación misma de si hubo o no tal consentimiento. [25] También se ha criticado en gran medida el ordenar los tribunales exámenes siquiátricos de las víctimas para determinar posibles padecimientos mentales que puedan llevarlas a hacer acusaciones falsas de violación producto de fantasías o alucinaciones sexuales. [26]

---

veredicto si la evidencia es insuficiente para una convicción. D. Luginbill, *op. cit.*, 24 Drake L. Rev. 669, 680 (1975), donde se estima que un sistema efectivo de jurado junto al poder del juez para ordenar la absolución por insuficiencia de evidencia para sostener su veredicto, son garantías suficientes para estos propósitos.

[24] Para un interesante recuento de lo que se ha hecho en varios estados de la unión norteamericana en cuanto a instrucciones: A. Arabian, *op. cit.*, pág. 585. El autor, juez de instancia en el caso de *People* v. *Rincón Pineda*, supra, decisión confirmada por el Supremo de California al descartarse las instrucciones de cautela en esa jurisdicción, se negó a impartir las mismas con las siguientes palabras:

"Sin embargo, a nosotros jueces del Tribunal de lo Criminal, en 1974, en tiempos iluminados y como ministros en la administración de justicia se nos pide nos arrodillemos en obediencia ciega ante esta regla y ordena instruir a doce personas laicas que el testimonio de estas víctimas debe examinarse con especial cautela.

"Encuentro que dar tal instrucción en este caso no se justifica ni en ley ni en razón, que ello discrimina arbitrariamente contra las mujeres, les deniega la igual protección de la ley y contribuye a la brutalización de las víctimas de violación al proveerse un balance desigual entre sus derechos y los derechos del acusado en corte."

California adoptó una instrucción en cuanto a credibilidad aplicable a todos los casos y a todo testigo. Comment, *supra*, 16 Santa Clara L. Rev. 691. Pratt, *op. cit.*, pág. 812 afirma que las palabras famosas de Lord Hales justifican más una instrucción de cautela que un requisito de corroboración. Note, *Effects of Corroboration Instructions in a Rape Case on Experimental Juries*, 15 Osgoode Hall L.J. 701 (1971).

[25] Lawrence, *What's Wrong with the Rape Reform Laws*, 3 Civil Liberties Review, No. 5, 60 (1976); Ireland, *op. cit.*, 49 Univ. of Colo. L. Rev. 185 (1978).

[26] O'Neale, *op. cit.*, 18 Santa Clara L. Rev. 119; y Note, *supra*, 67 Col. L. Rev. 1141–42 (1967).

■ En consideración a los fundamentos expuestos y que "de su faz infringe la prohibición constitucional de discrimen por razón de sexo, pues a priori arroja dudas sobre la suficiencia y veracidad del testimonio de toda mujer enervándolo frente al del hombre, cuya vigencia en nuestro ordenamiento jurídico no sólo representa un trato diferente, arcaico e injustificado atribuible a su condición única femenina, sino una afrenta que constantemente lesiona la dignidad humana de dicho ser ..." [27] *se dictará sentencia declarando inconstitucional lo dispuesto en la Regla 154 de las de Procedimiento Criminal requiriendo que el testimonio de la mujer perjudicada, en los procesos por delitos de violación o tentativas de cometerlo, sea corroborado cuando de la prueba surja la existencia de relaciones amistosas, o amorosas o íntimas o de igual naturaleza, con el acusado.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Rigau concurren en el resultado sin opinión.

---

[27] Voto separado *Pueblo* v. *Pagán Rivera,* 105 D.P.R. 493, 497 (1977).