El Juez Asociado Señor Martínez Torres
emitió la opinión del Tribunal.
Mediante petición de mandamus, la Asociación de Foto-periodistas de PR, Inc., la Asociación de Periodistas de PR, Inc., la Cyber News Multimedia, Inc., el Centro de Perio-dismo Investigativo, Inc. y el Overseas Press Club, nos so-licitan que ordenemos al Presidente del Senado, Hon. Thomas Rivera Schatz, a que cumpla con el mandato constitucional estatuido en la Sec. 11, Art. III de la Cons-titución de Puerto Rico, L.P.R.A., Tomo 1, y con el Regla-mento del Senado de 12 de enero de 2009, para permitirles acceso al hemiciclo senatorial durante las sesiones legislativas. El 2 de julio de 2010 la parte recurrida, sin someterse a la jurisdicción del Tribunal, solicitó la desesti-mación del recurso de mandamus, porque la controversia se tornó académica.
Posteriormente, el Presidente del Senado y el Secretario de ese cuerpo, Manuel Torres Nieves, presentaron un re-curso de certificación ante este Tribunal en el caso Eduardo Bhathia, et al. v. Thomas Rivera Schatz, et al., KPE-2010-2423(907), porque entienden que el foro de pri-mera instancia debió desestimar el caso por académico. La controversia en ese caso es la misma que en el recurso de mandamus que ya estaba ante nuestra consideración. Por esa razón se nos solicitó que consolidáramos ambos *926 recursos. Ante el alto interés público que rodea a esta con-troversia, y en virtud del poder que nos otorga el Art. 3.002 de la Ley de la Judicatura de Puerto Rico de 2003, Ley Núm. 201 de 22 de agosto de 2003, según enmendada, 4 L.P.R.A. sec. 24s, decidimos certificar. Evaluados ambos re-cursos, determinamos que son académicos y ordenamos su desestimación.
I — I

MD-2010-7

Los peticionarios en ese recurso aducen que el 24 y 25 de junio de 2010 el Presidente del Senado dio órdenes para que se desalojara al público y a miembros de la prensa que se proponían cubrir la sesión plenaria del Senado en que se habría de discutir el presupuesto de Puerto Rico. Como consecuencia de ello, se alegó que varios periodistas y foto-periodistas se vieron imposibilitados de cubrir y transmitir los procedimientos a llevarse a cabo en el Senado. A raíz de estos sucesos, el 29 de junio de 2010 la Asociación de Foto-periodistas de P.R., Inc., la Asociación de Periodistas de P.R., Inc., la Cyber News Multimedia, Inc., el Centro de Periodismo Investigativo, Inc., y el Overseas Press Club presentaron una petición de mandamus ante este Tribunal en la que solicitaron que se ordenase al Presidente del Se-nado cumplir con lo dispuesto en la Sec. 11 del Art. Ill de la Constitución de Puerto Rico, supra, que garantiza que las sesiones de las cámaras serán públicas, y permitir la asis-tencia del público y la prensa a la galería alta para presen-ciar los trabajos del Senado. En la alternativa, solicitaron que se ordenara al demandado cumplir con las disposicio-nes de la Sec. 26.1 del Reglamento del Senado, supra, pág. 77, sobre asistencia del público a la galería alta para pre-senciar la sesión senatorial, y con las disposiciones de la Sec. 26.11 del mismo reglamento relativas al palco de prensa, incluyendo, de ser necesario, una orden sobre el uso de cámaras que contenga los parámetros menos onero- *927 sos posibles al derecho a la información así como a la liber-tad de prensa y expresión.
El 30 de junio de 2010 las organizaciones de prensa pre-sentaron una moción suplementaria y una solicitud de re-medio adicional en la que señalaron que el 29 de junio de 2010 el Presidente del Senado envió una carta a todos los medios de comunicación para dilucidar las reglas de con-ducta que regirían el uso y acceso de las instalaciones des-tinadas a los medios de prensa en el Senado. Sin embargo, los demandantes advirtieron que, conforme dispone el Re-glamento del Senado, era necesaria una orden administra-tiva que regulara el acceso. Por ello, peticionaron que se le requiriera al Presidente del Senado adoptar una orden ad-ministrativa en la que se estableciera con claridad las re-glas sobre el acceso del público y la prensa al Senado.
El 2 de julio de 2010 el Presidente del Senado, sin so-meterse a la jurisdicción del Tribunal, presentó urna mo-ción en la que solicitó la desestimación de la petición de mandamus. En ésta, el Presidente del Senado alegó que
... mientras el Senado de Puerto Rico celebraba su sesión le-gislativa de forma ordinaria, un fotoperiodista se ubicó sobre un friso —el cual no tiene barandas de seguridad— colocán-dose en peligro de caerse o de que su cámara fotográfica ca-yera sobre las personas que se encontraban en el Hemiciclo, quien enfocó y tomó varias fotografías de documentos que se encontraban en el estrado presidencial, los cuales contenían análisis y recomendaciones sobre el presupuesto de la Isla, así como de otras medidas que se discutían en ese momento, que resultaban ser el producto del trabajo de sus asesores. Caso Núm. MD-2010-7, Moción de desestimación, pág. 1.
El Presidente del Senado adujo también que el fotope-riodista parecía intentar tomar fotos de la pantalla de su teléfono móvil. Por ello, solicitó al Jefe de Prensa y al Sar-gento de Armas del Senado que ordenaran a los fotoperio-distas abandonar el hemiciclo senatorial. Según alega el Presidente del Senado, en ese momento se suscitó una dis-cusión entre algunos funcionarios del Senado y varios miembros de la prensa, quienes supuestamente se subie-ron a unas sillas y comenzaron a gritar hacia la parte baja *928 del hemiciclo. Como resultado de lo anterior, el Presidente del Senado hizo uso de las prerrogativas concedidas por la See. 9, Art. Ill de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, y las Secs. 6.1(j), 6.1(r), 6.1(t) y 26.1 del Regla-mento del Senado, supra, págs. 13, 15-16 y 77, y restringió el acceso de la prensa hasta tanto se discutieran las reglas de conducta que regirían el uso y el acceso de las instala-ciones destinadas a los medios de prensa.
Asimismo, añadió que la controversia se había tornado académica, ya que el 29 de junio de 2010 firmó la Orden Administrativa 10-63, con el propósito de “Regular el uso de cámaras o equipo para captar imágenes en el Hemiciclo del Senado de Puerto Rico”. Con esta orden se reabrió el acceso a la prensa al área designada del hemiciclo senatorial.

CT-2010-7

Por los mismos hechos, el 28 de junio de 2010 el Hon. Eduardo Bhatia Gautier, Senador por Acumulación del Partido Popular Democrático (PPD), presentó una de-manda ante el Tribunal de Primera Instancia, Sala Superior de San Juan, contra el Presidente y el Secretario del Senado. En ella adujo que “estfaba] siendo afectado debido a que la inacción de los demandados ha puesto en peligro su derecho a la información pública e igual derecho de las personas que el Demandante representa”. Caso Núm. CT-2010-0007, Demanda, págs. 8-9. Es decir, el senador Bha-tia Gautier alegó que sus prerrogativas y funciones legis-lativas fueron menoscabadas como consecuencia de la conducta imputada al Presidente del Senado de exigir la salida o condicionar la entrada de algunos fotoperiodistas al palco destinado para los representantes de los medios noticiosos, durante los días 24 y 25 de jimio de 2010. Por ello, solicitó que se ordenara a los demandados proveer ac-ceso irrestricto a todos los representantes de los medios noticiosos a las sesiones senatoriales.
El 2 de julio de 2010 el senador Bhatia Gautier presentó una demanda enmendada en la que solicitó que se expi- *929 diera un mandamus, un injunction y una sentencia declaratoria. A esta demanda enmendada se le sumaron como partes demandantes varios senadores del PPD,(1) y el Sr. Víctor Lozano Santos, en calidad de ciudadano particular. En la demanda enmendada adujeron que las “actuaciones del Presidente del Senado constituyen con-ducta arbitraria, ilegal e inconstitucional que impiden que los Senadores demandantes pued[a]n descargar sus funcio-nes informativas como los representantes del pueblo de Puerto Rico y de mantener al pueblo al tanto de los proce-sos de deliberación, fiscalización [e] información que le co-rresponde como representantes del pueblo y de la minoría en oposición al gobierno en el poder”. Caso Núm. MD-2010-7, Demanda enmendada, págs. 7-8. Asimismo, aña-dieron que
... las actuaciones del Presidente del Senado, y/o empleados del Senado siguiendo instrucciones de éste, constituyen con-ducta arbitraria, ilegal e inconstitucional que impiden que el demandante, señor Víctor Lozano Santos, pueda mantenerse al tanto de los procesos legislativos de alto interés público que impactan al pueblo de Puerto Rico, ya que no es usuario de Internet, su municipio de residencia no tiene acceso al canal Cable Visión, número 10 de la compañía de Cable OneLink, el cual transmite las sesiones senatoriales y camerales, y, según las instrucciones del Presidente del Senado, habría sido ex-cluido, como todo otro ciudadano, de acceder las gradas para presenciar las sesión senatorial. Id., pág. 8.
Por todo lo anterior, “solicitaron que se declarara “con lugar” la demanda enmendada, que se emitiera una sen-tencia declaratoria en la que se declarara inconstitucional la conducta imputada al Presidente y al Secretario del Se-nado, que se le ordenara a estos últimos cesar y desistir de dicha práctica, y que se les ordenara, además, que cumplie-ran con el mandato constitucional de que las sesiones del Senado sean públicas.
*930 El 6 de julio de 2010 el Tribunal de Primera Instancia redujo el término para contestar la demanda en virtud de lo dispuesto en la Regla 68.2 de Procedimiento Civil, 32 L.P.R.A. Ap. Ill (ed. 2001), y le concedió al Presidente y al Secretario del Senado hasta el 7 de julio de 2010, es decir, un día, para contestar la demanda. También se consolidó la vista de injunction con el juicio en los méritos para el 9 de julio de 2010, es decir, tres días después. El 7 de julio de 2010 el Presidente y el Secretario del Senado presentaron ante este Tribunal un recurso de certificación, porque a su juicio, el foro de primera instancia carecía de jurisdicción para atender el asunto planteado. Solicitaron la expedición del auto y la consolidación del caso con el recurso de mandamus de las organizaciones de periodistas, para que las decisiones que se emitieran fuesen uniformes. Además, el Presidente y el Secretario del Senado urgieron que de forma urgente y en auxilio de nuestra jurisdicción, parali-záramos los procedimientos ante el foro de primera instan-cia hasta tanto se consideraran los planteamientos esgri-midos en el recurso de certificación. El 8 de julio de 2010 el Presidente y el Secretario del Senado presentaron una se-gunda moción urgente en auxilio de jurisdicción en la que requirieron nuevamente la paralización de los procedi-mientos ante el foro primario.
La sala de verano de este Tribunal refirió el asunto al pleno y el 9 de julio de 2010 emitimos una Resolución en la que expedimos el auto de certificación en el recurso CT-2010-7 y paralizamos los procedimientos ante el Tribunal de Primera Instancia hasta tanto nos expresáramos al respecto. También, consolidamos el recurso CT-2010-7 con el MD-2010-7 y concedimos cinco días improrrogables a la parte demandante para que alegara acerca del recurso de certificación.
El 15 de julio de 2010 la parte demandante presentó su escrito. Cabe señalar que el caso no quedó sometido antes de la presentación del alegato de la parte demandante en el recurso MD-2010-7. La indicación en contrario por núes- *931 tra Secretaria a las partes fue errónea. Nunca se dieron instrucciones a esos efectos. Por lo tanto, el caso no quedó sometido hasta tanto la Asociación de Periodistas y otros presentaron su alegato el 16 de julio de 2010.
Por otra parte, en vista de que la controversia ante nos es académica, no acogimos las peticiones presentadas por la Comisión de Derechos Civiles, la American Civil Liberties Union y por el Colegio de Abogados, quienes solicitaron su intervención como amicus curiae. Con el beneficio de las comparecencias de todas las partes, procedemos a resolver.
II
A. En múltiples ocasiones hemos expresado que los tribunales podemos evaluar únicamente aquellos casos que son justiciables. Moreno v. Pres. U.P.R. II, 178 D.P.R. 969 (2010); Lozada Tirado et al. v. Testigos Jehová, 177 D.P.R. 893 (2010); E.L.A. v. Aguayo, 80 D.P.R. 552 (1958). Los tribunales sólo debemos intervenir en controversias reales y vivas, en las cuales existan partes con intereses encontrados cuyo propósito sea obtener un remedio que tenga un efecto sobre la relación jurídica. E.L.A. v. Aguayo, supra, pág. 584. “[E]l principio de justiciabilidad como autolimitación del ejercicio del poder judicial responde en gran medida al papel asignado a la judicatura en una distribución tripartita de poderes, diseñada para asegurar que no intervendrá en áreas sometidas al criterio de otras ramas de gobierno”. Fund. Surfrider y otros v. A.R.Pe., 178 D.P.R. 563 (2010). Véanse, además, Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 720 (1980); Flast v. Cohen, 392 U.S. 83 (1968). “En vista de que la justiciabilidad es una doctrina autoimpuesta, los propios tribunales deben preguntarse y evaluar si es o no apropiado en-tender en un determinado caso, mediante un análisis que les permite ejercer su discreción en cuanto al límite de su poder constitucional.” Smyth, Puig v. Oriental Bank, 170 D.P.R. 73, 76 (2007).
*932 Para que una controversia sea justiciable se debe evaluar si es (1) tan definida y concreta que afecte las relaciones jurídicas entre las partes que tienen un interés jurídico antagónico; (2) que el interés sea real y substancial y que permita un remedio específico mediante una sentencia de carácter concluyente, y finalmente (3) si la controversia es propia para una determinación judicial, ya que se distingue de una disputa de carácter hipotético o abstracto, y de un caso académico o ficticio. E.L.A. v. Aguayo, supra, pág. 584. Por lo tanto, no será justiciable aquella controversia en la que: (1) se trata de resolver una cuestión política; (2) una de las partes no tiene legitimación activa; (3) después que ha comenzado el pleito, hechos posteriores la convierten en académica; (4) las partes buscan obtener una opinión consultiva, o (5) se promueve un pleito que no está maduro. Noriega v. Hernández Colón, 135 D.P.R. 406, 421—422 (1994).
Entre las doctrinas que autolimitan la intervención judicial está la academicidad. Rullán v. Fas Alzamora, 166 D.P.R. 742, 761 (2006). En esencia, con esta limitación sobre el poder de los tribunales se persigue evitar el uso innecesario de los recursos judiciales e impedir precedentes que resulten superfluos. P.N.P. v. Carrasquillo, 166 D.P.R. 70, 75 (2005); C.E.E. v. Depto. de Estado, 134 D.P.R. 927, 935-936 (1993).
Un caso es académico, cuando “se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes de que éste haya sido reclamado o una sentencia sobre un asunto que, al dictarse, por alguna razón no podrá tener efectos prácticos sobre una controversia existente”. San Gerónimo Caribe Project v. A.R.Pe., 174 D.P.R. 640, 652 (2008). Véanse, además: P.P.D. v. Gobernador I, 139 D.P.R. 643, 675 (1995); C.E.E. v. Depto. de Estado, supra; E.L.A. v. Aguayo, supra. “Hemos expresado que una controversia puede convertirse en académica cuando los cambios tácticos o judiciales acaecidos durante el trámite judicial torna *933 en ficticia su solución, convirtiéndose así en una opinión consultiva sobre asuntos abstractos”. San Gerónimo Caribe Project v. A.R.Pe., supra, págs. 652-653. Véanse, además: Báez Díaz v. E.L.A., 179 D.P.R. 605 (2010); P.P.D. v. Gobernador I, supra; Pueblo en interés menor M.A.G.O., 138 D.P.R. 20 (1995). Por lo tanto, al evaluar el concepto de academicidad “hay que concentrarse en la relación exis-tente entre los eventos pasados que dieron inicio al pleito y la adversidad presente”. P.P.D. v. Gobernador I, supra, pág. 676. Así pues, un caso se convierte en académico cuando con el paso del tiempo su condición de controversia viva y presente se ha perdido. íd.
Sin embargo, existe una “serie de excepciones a la doctrina de academicidad que permiten la consideración de un caso que, de otro modo, resultaría académico en cuanto a su resultado o efecto inmediato”. P.P.D. v. Gobernador I, supra, pág. 676. Así, por ejemplo, operan las excepciones a la academicidad cuando se plantea ante el tribunal: (1) urna cuestión recurrente o susceptible de volver a ocurrir; (2) cuando el demandado ha modificado la situación de hechos, pero el cambio no aparenta ser permanente, y (3) cuando aspectos de la controversia se tornan académicos pero subsisten consecuencias colaterales que tienen vigencia y actualidad. U.P.R. v. Laborde Torres y otros I, 180 D.RR. 253 (2010); Báez Díaz v. E.L.A., supra; Moreno v. Pres. U.P.R. II, supra. Véanse, además: San Gerónimo Caribe Project v. A.R.Pe., supra; Angueira v. J.L.B.P., 150 D.P.R. 10 (2000); P.P.D. v. Gobernador I, supra. Sin embargo, como señalamos recientemente en Moreno v. Pres. U.P.R. II, supra, pág. 7, “[e]stas excepciones tienen que usarse con mesura, pues no se pueden obviar los límites constitucionales que inspiran la doctrina de academicidad”.
Es contención de los demandantes que, a pesar de la orden administrativa, estamos ante una “controversia viva, que no se despeja ni aclara con” esa orden. Caso Núm. MD-2010-7, Oposición a moción de desestimación, pág. 3. *934 Es decir, los demandantes entienden que, a pesar de la promulgación de la orden administrativa, existe la posibi-lidad de que la conducta alegada se repita.
En el pasado hemos manifestado que la excepción de recurrencia aplica si concurren tres elementos específicos. Primero, la probabilidad de la recurrencia. En segundo lugar, la identidad entre las partes involucradas, y por último, la probabilidad de que el asunto sea capaz de evadir la revisión judicial. Moreno v. Pres. U.P.R. II, supra. Véanse, además: Angueira v. J.L.B.P., supra; J.J. Alvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, págs. 186-188.
El primero de los requisitos a la excepción de recurren-cia “requiere que exista una ‘probabilidad razonable’ de que la controversia pueda repetirse”. Es decir, el
... asunto debe ser de una naturaleza tal que evada su adju-dicación o revisión. Esto sucede con mayor frecuencia en aque-llas controversias que son de por sí de muy corta duración, pero puede haber otras razones además de la brevedad crono-lógica que ocasionen que una controversia sea capaz de eludir la revisión judicial. Asoc. de Periodistas v. González, 127 D.P.R. 704, 721 (1991).
El segundo requisito de identidad de las partes “tiene el fin de fomentar la abstención judicial en situaciones en que los litigantes pudieron haber perdido el incentivo para con-tinuar litigando vigorosamente el caso. Por tal razón, como regla general, debe existir tanto la capacidad de que se repita la controversia como la posibilidad de que la recu-rrencia sea entre las mismas partes”. P.N.P. v. Carrasquilla, supra, pág. 77.
El tercero y último requisito, “requiere que el daño sea ‘inherentemente de tan corta duración que sea probable que la controversia siempre se torne académica antes de que la litigación se complete’ ”. P.N.P. v. Carrasquillo, supra, pág. 76, citando a E. Chemerinsky, Constitutional Law Principles and Policies, 2da ed., Nueva York, Ed. Aspen, 2002, págs. 49-50.
*935 La Regla 10.2 de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V) “establece los fundamentos por los que una parte puede solicitar la desestimación de una demanda presentada en su contra, a saber: falta de jurisdicción so-bre la materia o la persona, insuficiencia del emplaza-miento o su diligenciamiento, dejar de exponer una recla-mación que justifique la concesión de un remedio o dejar de acumular una parte indispensable”. Secretariado de la Conferencia Judicial y Notarial, Informe de Reglas de Pro-cedimiento Civil, Tribunal Supremo de Puerto Rico, marzo 2008, pág. 134. Como vemos, la Regla 10 de Procedimiento Civil
... enumera seis defensas que hay que presentar en la alega-ción respondiente —cuando ésta se requiere— o, en todo caso, mediante moción fundamentada antes de alegar. Aunque toda defensa u obligación no renunciada puede presentarse en una alegación responsiva, la Regla 10 permite que se planteen, mediante moción de desestimación, antes de alegar. J.A. Cue-vas Segarra, Tratado de Derecho Procesal Civil, San Juan, Pubs. J.T.S., 2000, T. I, pág. 270.
[10] Al evaluar una moción de desestimación debe-mos dar por ciertas y buenas todas las alegaciones fácticas hechas en la demanda. Además, hay que interpretarlas a favor de la parte demandante. Harguindey Ferrer v. U.I., 148 D.P.R. 13 (1999). Así pues, para desestimar un caso por falta de jurisdicción sobre la materia “es necesario deter-minar si, tomando como cierto lo alegado por el deman-dante, el foro tiene jurisdicción para atender el reclamo”. Id., pág. 30. La defensa de falta de jurisdicción sobre la materia está siempre disponible por moción de parte o por iniciativa del tribunal. Cuevas Segarra, op. cit., pág. 286.
Como la jurisdicción es el poder o autoridad que posee un tribunal para considerar y decidir un caso o con-troversia, “su ausencia (1) no es susceptible de ser subsa-nada; (2) las partes no pueden voluntariamente conferír-sela a un tribunal como tampoco puede éste abrogársela; (3) conlleva la nulidad de los dictámenes emitidos; (4) im-pone a los Tribunales el ineludible deber de auscultar su *936 propia jurisdicción; (5) impone a los tribunales apelativos el deber de examinar la jurisdicción del foro de donde pro-cede el recurso, y (6) puede presentarse en cualquier etapa del procedimiento a instancia de partes o por el tribunal motu proprio”. Cuevas Segarra, op. cit., pág. 287. Véanse, además: González v. Mayagüez Resort Casino, 176 D.P.R. 848 (2009); ASG v. Mun. San Juan, 168 D.P.R. 337 (2006); Pagán v. Alcalde Mun. de Cataño, 143 D.P.R. 314, 326 (1997); Vázquez v. A.R.Pe., 128 D.P.R. 513 (1991).
Una vez surge por indicación de las partes o de algún otro modo que el tribunal carece de jurisdicción, entra en operación el inciso (c) de la Regla 10.8 de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V), que ordena la desestimación del pleito. Las cuestiones jurisdiccionales deben ser resueltas con preferencia, y de determinar un tribunal que carece de jurisdicción, “debe desestimar ... la reclamación ‘sin entrar en los méritos de la cuestión ante sf ”. González v. Mayagüez Resort Casino, supra, pág. 11, citando González Santos v. Bourns P.R., Inc., 125 D.P.R. 48, 63 (1989).
Por lo tanto, una vez se determina que un pleito es académico y que no está presente ninguna de las excepciones que evadirían su academicidad, es deber de los tribunales desestimarlo. E.L.A. v. Aguayo, supra, pág. 562. Véase, además, Little v. Bowers, 134 U.S. 547 (1890). No está dentro de la prerrogativa del poder judicial no hacerlo. Moreno v. Pres. U.P.R. II, supra. Véanse, además: Alvarez v. Smith, 130 S.Ct. 576, 175 L.Ed.2d 447; Alabama v. Davis, 446 U.S. 903 (1980); United States v. Munsingwear, Inc., 340 U.S. 36 (1950); Duke Power Co. v. Greenwood County, 299 U.S. 259, 267 (1936).
Ahora bien, adviértase que con la desestimación no se cierran las puertas de los tribunales. Por el contrario, de repetirse la situación, se “deja el camino libre a la litiga-ción futura de las disputas entre las partes y preserva sus derechos, sin perjudicar a ninguna de ellas por una deci-sión que era meramente preliminar”. Moreno v. Pres. *937 U.P.R. II, supra, pág. 975. Véanse, además, Álvarez v. Smith, 130 S.Ct. 576, 581, citando United States v. Musingwear, Inc., 340 U.S. 36 (1950).
B. La alegada prohibición de la presencia de la prensa en las sesiones legislativas por parte del Presidente del Senado dio paso a la demanda que hoy nos ocupa. No está en disputa que la conducta alegada cesó a raíz de la pro-mulgación de la Orden Administrativa 10-63, con la que se reguló el uso de cámaras o equipo para captar imágenes en el hemiciclo senatorial.
Sin embargo, en su oposición a la moción de desestima-ción, la parte demandante arguye que “[l]a expulsión arbi-traria de la prensa está igualmente asequible en el futuro ... bajo los parámetros de la orden [promulgada]”. Caso Núm. MD-2010-7, Oposición a moción de desestimación, pág. 3. Entienden los demandantes que “[n]o hay paráme-tros de interpretación de los términos vagos y ambiguos de la orden”. Id., pág. 5. Por lo tanto, concluyen que es probable que se repita la alegada conducta del Presidente del Senado en el pasado. Por consiguiente, razonan que la con-troversia ante nos cumple con una de las excepciones a la academicidad, a saber, la recurrencia.
A todas luces, la controversia ante nos no cumple con el primer requisito para que opere esta excepción, es decir, la probabilidad de recurrencia. Concluir que la supuesta con-ducta desplegada por el Presidente del Senado en las se-siones legislativas volverá a ocurrir, conllevaría “adentrar-nos en el campo de la especulación”. Moreno v. Pres. U.P.R. II, supra, pág. 976. En iguales términos nos expresamos en Presidente de6 la Cámara v. Gobernador, 167 D.P.R. 149, 159 (2006), cuando determinamos que no resultaba opor-tuna nuestra intervención pues “[a]ún asumiendo que el ambiente político y económico de Puerto Rico es propicio para que la controversia surja nuevamente, resulta igual-mente especulativo resolver que dicho asunto pueda evadir la revisión judicial”.
Tampoco estamos ante la excepción de cese vo- *938 luntario por parte de la parte demandada, pero sin visos de permanencia, como señalan equivocadamente la Juez Aso-ciada Señora Rodríguez Rodríguez en su opinión disidente y la Jueza Asociada Señora Fiol Matta en su expresión disidente. Esta excepción a la doctrina de academicidad opera cuando “la terminación voluntaria de una conducta no tornará académica una controversia salvo que los even-tos subsiguientes hagan absolutamente claro que no es ra-zonable esperar que la alegada conducta impugnada vuelva a ocurrir”. U.P.R. v. Laborde Torres y otros I, supra, págs. 282-283. “Por eso, un caso es académico solo si: (1) puede asegurarse que la violación alegada no va a volver a ocurrir y (2) el remedio provisional concedido o los eventos acaecidos han erradicado completa e irrevocablemente los efectos de la violación alegada”. Id., pág. 283. “El peso de la prueba recae en la parte que alega que el pleito es académico.” Id.
A la luz de lo anterior, es evidente que no estamos de-clarando académica esta controversia por un “acto de fe”, como señala la Juez Asociada Señora Rodríguez Rodríguez en su opinión disidente. Con la vigencia de la Orden Admi-nistrativa Núm. 10-63 de 12 de enero de 2009, existe la obligación de los demandados de cumplir con su mandato. No estamos ante una orden de aprobación temporera; se trata de una orden con vigencia inmediata y sin límites de tiempo para su eficacia. No podemos, apenas días después de su aprobación, suponer que esa orden será letra muerta. Llegar a esa conclusión crearía inseguridad en nuestra ciu-dadanía, que confía en que las leyes y los reglamentos es-tán para cumplirse y oponerse a cualquiera que no los siga. En deferencia hacia un poder hermano, no adjudicaremos un hecho que en este momento es puramente figurativo. Concluir de otra forma sería adentrarnos en el debate par-tidista para insinuar que la Rama Legislativa burla a su Pueblo. No podemos suponer eso.
No olvidemos que los demandados cuentan con la opor-tunidad de acudir a los tribunales de incumplirse con la orden decretada. Es decir, cualquier periodista o fotoperio- *939 dista afectado puede comparecer a los tribunales a solicitar su cumplimiento. Por esa razón, la controversia no escapa-ría la revisión judicial.
Como señalamos también en Presidente de la Cámara v. Gobernador, supra, pág. 160, mediante el Art. 3.002(e) de la Ley de la Judicatura de Puerto Rico de 2003 (4 L.P.R.A. sec. 24s(e)), “nuestro ordenamiento jurídico cuenta con el mecanismo adecuado para revisar este tipo de controversia con mayor agilidad” en caso de que resurja. Este artículo hace viable la certificación, y por consiguiente, adelanta el trámite judicial ordinario con el objetivo de que este Tribunal pueda atender cuestiones que por su gran importancia y envergadura ameritan ser resueltas prontamente. íd. Véase, además, Rivera v. J.C.A., 164 D.P.R. 1 (2005). “En fin, la existencia del recurso de certificación elimina prác-ticamente la posibilidad de que este tipo de casos evada nuestro pronunciamiento sobre el asunto.” Presidente de la Cámara v. Gobernador, supra, págs. 160-161. Véase, además, U.P.R. v. Laborde Torres y otros I, supra.
Por último, es norma reiterada que
[e]n ausencia de circunstancias que ameriten la intervención judicial, no estamos en posición de emitir directrices con el propósito de guiar al Ejecutivo y al Legislativo en la enco-mienda que los electores le han delegado .... Todas estas con-sideraciones ameritan nuestra prudencia y abstención en es-tas circunstancias no aptas para la intervención judicial. Presidente de la Cámara v. Gobernador, supra, pág. 162.
Por ello entendemos que ésta no es la ocasión propicia para un pronunciamiento nuestro.
Ello no obstante, la Juez Asociada Señora Rodríguez Ro-dríguez aduce que la doctrina de academicidad se encuen-tra en un “estado pantanoso” en esta jurisdicción. A ren-glón seguido, la Juez Asociada hace una apreciación muy particular de nuestras opiniones anteriores sobre el tema para concluir que la decisión de hoy de este Tribunal “con-trasta marcadamente con lo que ha sido su postura en ca-sos recientes”.
*940 No vamos a discutir de nuevo los fundamentos de nues-tras decisiones anteriores. Basta echarles un vistazo para conocerlos. Lo relevante es que los cambios en los hechos o el derecho determinan la academicidad de una controver-sia judicial. U.P.R. v. Laborde Torres y otros I, supra, pág. 33; El Vocero v. Junta de Planificación, 121 D.P.R. 115, 123 (1988). Por eso, los casos citados son claramente distinguibles.
Por ejemplo, el Juez Presidente Señor Hernández Den-ton apunta que fuimos laxos al aplicar la doctrina de aca-demicidad en Suárez Cáceres v. Com. Estatal Elecciones [I], 175 D.P.R. 909 (2009). Difícilmente puede afirmarse que no había una controversia viva en un caso que terminó adjudicando a qué candidato le correspondía ocupar un es-caño senatorial. Véase Suárez Cáceres v. Com. Estatal Elecciones [II], 176 D.P.R. 31 (2009). Con todo respeto, la única incongruencia que atisbamos es que al disentir de la expedición del auto, el Señor Juez Presidente señaló que el escaño tendría que adjudicarse mediante un sorteo, pero al disentir de nuestra decisión seis semanas después, con-cluyó que procedía certificar a uno de los dos candidatos, por la proporción de votos obtenidos y sin la necesidad de efectuar sorteo alguno.
Por otro lado, en Pueblo v. Pagán Medina, 177 D.P.R. 842 (2010), nos enfrentamos a una situación que se repetía con frecuencia pero evadía su solución, ya que
... como el procedimiento penal continuará su curso, y los términos de juicio rápido obligan al Estado a actuar con lige-reza, con toda probabilidad la revisión de la orden de excarce-lación ante el Tribunal de Apelaciones y luego ante esta Curia, no será resuelta de manera definitiva antes de que comience el juicio del imputado. Como es sabido, una vez comenzado el juicio, la cláusula constitucional de detención preventiva [Art.
II, Sec. 11, Const. P.R., L.P.R.A., Tomo 1] dejará de tener vi-gencia y el asunto se tornará en uno académico. He aquí la naturaleza efímera de la controversia ante nuestra consideración. (Enfasis y escolio omitidos.) Id., págs. 847-848.
Por último, en U.P.R. v. Laborde Torres y otros I, supra, *941 resolvimos que el caso de injunction de la Universidad de Puerto Rico contra un grupo de estudiantes no era acadé-mico porque el Consejo de Estudiantes aprobó un llamado “voto preventivo de huelga” que amenazaba con que se re-pitiera la conducta alegada que había motivado la demanda. En el acuerdo entre las partes después de un proceso de mediación, ni siquiera hubo un compromiso de la parte demandada de no incurrir de nuevo en la conducta que se le imputó. En cambio, ahora nos encontramos ante un cese permanente de la conducta alegada, evidenciada por una orden administrativa del Senado que garantiza la presencia de la prensa en la galería del hemiciclo.
Para refutar esta clara diferencia, la opinión disidente procede a impugnar la constitucionalidad de la orden ad-ministrativa, sin que exista una persona afectada adversa-mente por ella. Rehusamos adentrarnos en esa ciénaga procesal. Sería esa intervención a destiempo, “zigzaguean-te y dúctil”, la que podría crear la “impresión de que el marco legal se adapta a las necesidades de los actores po-líticos ...”. Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, págs. 973 y 974.
Por eso, objetamos la metáfora del “vaivén de las olas” que la Juez Asociada Señora Rodríguez Rodríguez men-ciona en su opinión disidente, con exceso de sorna y ausen-cia total de corrección jurídica.(2) De igual modo, rechaza-mos cualquier reacción a esta decisión cuyo único propósito *942 sea, como la resaca mañanera, nublar el entendimiento y provocar bascas. En cambio, le damos la bienvenida a la crítica seria, basada en el Derecho y en la intención loable de lograr que se haga justicia. Lo que rechazamos es lo que el filósofo Max Scheler llamó la “crítica resentida”, que “se caracteriza por no querer en serio lo que pretende que-rer ...”. M. Scheler, El resentimiento en la moral, (J. Gaos, trad.), Buenos Aires, Ed. Espasa-Calpe, 1938, pág. 26.
III
Como mencionamos anteriormente, otro de los instrumentos de autolimitación y de prudencia judicial que tiene su origen en la doctrina de justiciabilidad es la legitimación activa o el standing de quienes acuden a los tribunales a vindicar sus derechos. Col. Ópticos de P.R. v. Vani Visual Center, 124 D.P.R. 559, 563 (1989). “Después de todo, el examen de la legitimación activa es un mecanismo usado por los tribunales para delimitar su propia jurisdicción y no adentrarse en los dominios de otras ramas de gobierno, y no lanzarse a resolver cuestiones hipotéticas o planteadas dentro de un contexto inadecuado.” (Escolio omitido.) Hernández Torres v. Hernández Colón et al., 131 D.P.R. 593, 598 (1992). Véase, además, E.L.A. v. P.R. Tel. Co., 114 D.P.R. 394, 399 (1983). Con ello se persigue “que el promovente de la acción [sea] uno cuyo interés es de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia”. Hernández Torres v. Hernández Colón et al, supra, pág. 599, citando a Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 413 (1982). Véanse, además: Col. Ópticos de *943 P.R. v. Vani Visual Center, supra; Flast v. Cohen, supra, págs. 99-100.
Para determinar si una parte tiene legitimación activa debe cumplir con los requisitos siguientes: (1) haber sufrido un daño claro y palpable; (2) que el referido daño sea real, inmediato y preciso, y no abstracto o hipotético; (3) una conexión entre el daño sufrido y la causa de acción ejercitada, y (4) que la causa de acción surja bajo el palio de la Constitución o de una ley. Lozada Tirado et al. v. Testigos Jehová, supra. Véanse, además: Col. Peritos Elec. v. A.E.E., 150 D.P.R. 327, 331 (2000); Asoc. Maestros P.R. v. Srio. Educación, 137 DP.R. 528, 535 (1994). Asimismo, hemos señalado que “un legislador personal y directamente afectado por una actuación gubernamental puede cuestionar la constitucionalidad de una ley o de una actuación estatal al amparo de los derechos de terceras personas igualmente perjudicadas, siempre que cumpl[a] con los requisitos estrictos de la doctrina de ius tertii”. Hernández Torres v. Gobernador, 129 D.P.R. 824, 838-839 (1992). Véase, además, Noriega v. Gobernador, 122 D.P.R. 650 (1988).
Por otra parte, como regla general, hemos establecido que las partes “tienen capacidad tan solo para plantear sus propios derechos contra actos alegadamente ilegales del gobierno”. C.E.S. U.P.R. v. Gobernador, 137 D.P.R. 83, 106 (1994), citando a E.L.A. v. P.R. Tel. Co., supra, pág. 396. Véase, además, Zachry International v. Tribunal Superior, 104 D.P.R. 267, 271 (1975). “La norma no. tiene rango constitucional y únicamente es un método que los tribunales emplean de forma voluntaria para ejercer con moderación y prudencia sus poderes constitucionales.” C.E.S. U.P.R. v. Gobernador, supra, pág. 106. Véase, además, E.L.A. v. P.R. Tel. Co., supra, págs. 396-397. “La tendencia actual es decididamente hacia la liberalización y simplificación de las normas que rigen esta zona del Derecho.” E.L.A. v. P.R. Tel. Co., supra, pág. 398. Por ello, *944 algunos comentaristas consideran “que se debe reconocer la capacidad para invocar el jus tertii en todo caso, excepto: (1) cuando el tribunal crea razonablemente que el litigante no representará debidamente el interés de los terceros con-cernidos, o (2) cuando el cuadro de hechos no sea lo sufi-cientemente concreto como para permitir la adjudicación de las cuestiones presentadas, conforme las normas relati-vas a la madurez de las controversias”. Id. Además, debe haber “una relación causal entre el daño al litigante y la acción gubernamental impugnada”. Id.(3)
En Hernández Torres v. Hernández Colón et. al., supra, enumeramos varias instancias en las que los legisladores están legitimados para acudir a los tribunales. Por ejemplo,
... cuando la controversia trata sobre la elegibilidad del legis-lador a ocupar un escaño legislativo, Santa Aponte v. Srio. del Senado, 105 D.P.R. 750 (1977); cuando alguna de las Cámaras ha autorizado a uno o varios legisladores a vindicar derechos y prerrogativas de dicha Cámara, Hernández Agosto v. Romero Barceló, supra, pág. 413; Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576 (1983); cuando se cuestionan reglas senatoriales que coartan sus derechos constitucionales a participar en las etapas esenciales y significativas en las comisiones de la Cámara Alta, Silva v. Hernández Agosto, 118 D.P.R. 45 (1986), y por último, cuando un legislador se ve afectado directamente en su carácter personal por acciones gubernamentales, éste puede impugnar la constitucionalidad de una ley o actuación gubernamental. Noriega v. Gobernador, 122 D.P.R. 650 (1988). Hernández Torres v. Hernández Colón et al., supra, págs. 599-600.
En Hernández Torres v. Gobernador, supra, pág. 840, establecimos los criterios que deberán utilizar los tribuna-les para evaluar la legitimación activa de un legislador. A esos efectos, señalamos que un legislador debe demostrar *945 un daño claro y palpable, y cumplir con los criterios de legitimación aplicables a cualquier ciudadano particular. Además, en Hernández Torres v. Hernández Colón et al., supra, pág. 601, establecimos que el daño sufrido por el legislador debe ser uno “claro e inmediato a sus prerroga-tivas legislativas. Claro, no se trata de unas prerrogativas abstractas y que en nada tengan que ver con el ejercicio de sus funciones legislativas”. Apuntamos además que “las prerrogativas legislativas son la garantía que tiene todo legislador a ejercitar plenamente su derecho constitucional a legislar comprendido en el Art. Ill, Sec. 1 de la Constitu-ción del Estado Libre Asociado, L.P.R.A., Tomo 1”. íd. Véanse, además: Silva v. Hernández Agosto, supra; Her-nández Agosto v. Romero Barceló, supra. “Los tribunales deberán quedar convencidos de que no se trata de un tras-lado del debate legislativo al foro judicial y sí de una ver-dadera lesión a sus prerrogativas legislativas.” Hernández Torres v. Hernández Colón et al., supra, pág. 601.
Asimismo, expresamos que es necesario que los legisladores prueben “que existe una conexión entre el daño sufrido y la acción que pretenden ejercitar”. Hernández Torres v. Hernández Colón et al., supra. Por lo tanto, los legisladores no tienen legitimación activa para impugnar la validez de un estatuto únicamente en representación del interés de la ciudadanía en general. Corresponde a los ciudadanos directamente perjudicados, que hayan sufrido un daño claro y palpable, recurrir a los tribunales en defensa de sus intereses. Hernández Torres v. Gobernador, supra, pág. 843. Es decir, “[s]us alegaciones no pueden es-tar basadas en que acuden al tribunal representando a sus constituyentes en vindicación de un interés general”. Hernández Torres v. Hernández Colón et al., supra, pág. 601.
Cuando un legislador aduce que sus prerrogativas como legislador se ven afectadas debido a que no puede fiscalizar adecuadamente la obra legislativa, debe poder demostrar que no existen mecanismos razonables y necesarios que hagan viable su participación plena en todas las *946 etapas críticas del proceso legislativo. Hernández Torres v. Hernández Colón et al., supra, pág. 602. “Es por esto que una mera alegación de que no se le permite fiscalizar no tiene el efecto automático de otorgarle legitimación activa para presentar una acción ante los tribunales.” Id.
Tampoco es suficiente que el legislador alegue que una ley menoscaba las prerrogativas de su cargo. Al respecto, en Raines v. Byrd, 521 U.S. 811 (1997), varios congresistas que habían votado en contra de la Ley de Veto de Línea (Line Item Veto Act) cuestionaron su constitucionalidad porque supuestamente diluía sus derechos consagrados en el Art. I de la Constitución de Estados Unidos como miem-bros del Congreso. El Tribunal Supremo federal resolvió que los congresistas no ostentaban legitimación activa. Concluyó que la reclamación de dilución de los poderes ins-titucionales de los congresistas no es suficiente para soste-ner un daño particular e individualizado. Se trata de un daño generalizado, compartido por todos los congresistas. Es decir, los congresistas no tenían un interés personal su-ficiente en la controversia y no alegaron un daño concreto para cumplir con los requisitos mínimos de legitimación activa dispuestos en el Art. Ill de la Constitución de Esta-dos Unidos. El tribunal dejó claro que no estaba ante una situación en la que los votos se anularon o se le prohibió a un congresista ocupar el escaño para el que fue elegido. A diferencia de un reclamo de inconstitucionalidad de una ley, esas son circunstancias directamente relacionadas con las prerrogativas legislativas. La norma es cónsona con lo que hemos resuelto al amparo de la Constitución de Puerto Rico respecto a los legisladores.
IV
A. En lo que respecta a la demanda presentada por los senadores del PPD, tenemos que concluir que éstos no han podido demostrar que se les haya causado un daño claro e inmediato a sus prerrogativas legislativas. En ningún mo- *947 mentó se privó a estos legisladores de ejercer su derecho a votar en contra de una legislación, ni a “discutir y conven-cer a sus opositores de los defectos de la legislación”. Hernández Torres v. Hernández Colón et al., supra, pág. 604. Mucho menos se les requirió que abandonaran su escaño en el hemiciclo. Raines v. Byrd, supra. Los legisladores no han podido demostrar que las garantías contenidas en el Art. III, Sec. 1 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, de ejercer plenamente su derecho a legislar, han sido menoscabadas.
Asimismo, los legisladores no han probado que existe un nexo entre el daño alegadamente surgido y la acción que hoy ejercen. Más aún, la alegación de que acuden a los tribunales en representación del pueblo ha sido rechazada antes por este Tribunal. En Hernández Torres v. Gobernador, supra, dejamos claro que un legislador no puede acu-dir a los tribunales con alegaciones basadas en que lo hace en representación de sus constituyentes, es decir, en de-fensa de un interés general.
Por otra parte, en el pleito que certificamos aparece como parte demandante el señor Lozano Santos. Este alega únicamente que si hubiera acudido en el día de los hechos al hemiciclo a presenciar los procesos legislativos, se le habría negado la entrada. El señor Lozano Santos en ningún momento arguye que acudió al Senado a presenciar los trabajos legislativos y se le negó la entrada. Por lo tanto, sus argumentos son meras especulaciones de lo que le pudo haber sucedido de haber acudido al hemiciclo senatorial.
El primero de los requisitos que establece la doctrina de legitimación activa requiere poder demostrar que se sufrió un daño claro y palpable. Lo cierto es que el señor Lozano Santos no sufrió ningún daño. Los daños que alega son puramente hipotéticos y abstractos, pues nadie le negó ac-ceso a las graderías del Senado, a las que nunca acudió.
Por todo lo anterior, concluimos que los senadores de-mandantes en el recurso CT-2010-7 tampoco cuentan con *948 legitimación activa para reclamar a nombre de la ciudada-nía en general, los derechos consagrados en la Sec. 11 del Art. Ill de la Constitución de Puerto Rico, L.P.R.A., Tomo 1. Tampoco ostentan legitimación activa para vindicar los derechos del demandante, Sr. Víctor Lozano Santos.
B. En resumen, la controversia ante nuestra conside-ración se tornó académica con la promulgación de la orden administrativa que reguló el acceso de la prensa al hemi-ciclo senatorial. Por ello, estamos impedidos de pronun-ciarnos sobre los señalamientos constitucionales argüidos por las partes peticionarias.
La contundencia del reclamo de academicidad que hicie-ron el Presidente y el Secretario del Senado aconsejaba que el Tribunal de Primera Instancia le diera consideración de-tallada y sosegada. Después de todo, al citar el caso para vista estaba en vigor la orden administrativa y nadie ale-gaba que se le estaba excluyendo del hemiciclo del Senado en ese momento. Además, la misma controversia y la misma defensa de academicidad ya estaban planteadas en el recurso de mandamus MD-2010-7, pendiente ante nos. Todo lo anterior sugería considerar con más detenimiento la moción de desestimación en lugar de citar a una vista evidenciaría en los méritos con menos de 72 horas de antelación. Por eso nos resulta incomprensible la premura inusitada de la Hon. Rebecca De León Ríos para señalar una vista evidenciaría en un caso académico. Eso nos forzó a intervenir y certificar el recurso con igual o mayor pre-mura, para evitar una violación de los principios básicos de justiciabilidad que siempre han regido en esta jurisdicción.
V
Por los fundamentos anteriormente señalados, se deses-tima la petición de mandamus MD-2010-7 y se desestima la demanda en el recurso CT-2010-7.

Se dictará sentencia de conformidad.

*949 El Juez Presidente Señor Hernández Denton concurrió con una opinión escrita. La Juez Asociada Señora Rodrí-guez Rodríguez disintió con una opinión escrita. La Jueza Asociada Señora Fiol Matta disintió al entender que el análisis de la doctrina de academicidad que se requiere en este caso corresponde a la excepción sobre la ausencia de visos de permanencia en la conducta del demandado, en vez de la excepción de recurrencia que utiliza la mayoría del Tribunal. De igual forma, entiende que la conducta del demandado que tornó académica la controversia no refleja suficientes visos de permanencia y deja al arbitrio de la parte demandada incurrir nuevamente en la conducta im-pugnada, tal y como resolvió este Tribunal en U.P.R. v. Laborde Torres y otros I, 180 D.P.R. 253 (2010).

 Como parte demandante se unieron los senadores, Hons. Eder Ortiz Ortiz, Sila Mari González Calderón, Juan Eugenio Hernández Mayoral, Jorge Suárez Cá-ceres, José Luis Dalmau, Alejandro García Padilla y Antonio Fas Alzamora.

 La expresión a la que se refiere la Juez Asociada Señora Rodríguez Rodrí-guez no tiene el alcance que ella insinúa. Eso quedó meridianamente claro en Martínez Román y otros v. E.L.A., 177 D.RR. 569 (2009), opinión del Juez Asociado Señor Martínez Torres y de la Jueza Asociada Señora Pabón Charneco referente a moción de inhibición. Como se señaló entonces, “los electores eligen sus gobernantes en la Rama Ejecutiva y el Senado, y les encomiendan la nominación y confirmación, res-pectivamente, de los Jueces del Tribunal Supremo. A ese proceso le he llamado el ‘flujo normal de la marea judicial en una democracia, producto indirecto del mandato del Pueblo expresado donde corresponde, en las urnas’ ”. íd., pág. 572. Véase, ade-más, Yiyi Motors, Inc. v. E.L.A., 177 D.P.R. 230 (2009), opinión de conformidad.
“Solamente una mente prejuiciada o de escasa cultura jurídica puede interpre-tar esa última frase como una advertencia de que los recursos ante este Tribunal se van a resolver conforme al resultado de las elecciones generales o a favor del Poder Ejecutivo.” (Escolio omitido.) Martínez Román y otros v. E.L.A., supra, pág. 573.
*942 Es decir: “Las decisiones, a diferencia de los nombramientos, responden a los hechos y al Derecho. Se ajustan a la conciencia libre e independiente del juez y no a los deseos de los políticos. Se emiten con total imparcialidad e independencia de criterio judicial, con absoluta fidelidad a la Constitución y las leyes, y de acuerdo con los hechos que están ante el Tribunal”. (Énfasis en el original.) Id., pág. 571.

 En Zachry International v. Tribunal Superior, 104 D.P.R. 267, 272 (1975), resumimos así los criterios para invocar los derechos constitucionales de terceros: “(1) el interés del litigante; (2) la naturaleza del derecho invocado; (3) la relación existente entre el litigante y las terceras personas, y (4) la factibilidad de que los terceros puedan hacer valer tales derechos en una acción independiente ...”. Estos criterios han sido muy criticados. Véase E.L.A. v. P.R. Tel. Co., 114 D.P.R. 394 (1983).